**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **CHRISTINA K. CONNEARNEY,** | |
| *Plaintiff*, | **CIVIL ACTION** |
| v. | **NO. 15–02730** |
| **MAIN LINE HOSPITALS, INC. et al.,** | |
| *Defendants*. | |

**PAPPERT, J.**                                                                 **DECEMBER 22, 2015**

## MEMORANDUM

Plaintiff Christina Connearney ("Connearney") sued her former employer, Lankenau Medical Center ("Lankenau"), its parent company Main Line Hospitals, Inc.[1] ("MLH"), and a number of Lankenau employees (collectively "Defendants"). The gravamen of Connearney's Complaint seems to be that the then 47 year old plaintiff was fired to make room for a younger replacement, and thus discriminated against on account of her age. That straightforward premise somehow evolved into a pleading which asserts seventeen disparate causes of action, some of which do not apply to the factual context outlined in the Complaint while others do not exist under the law in any context. Before the Court is Defendants' Motion to Dismiss Connearney's Complaint. (ECF No. 4.) After laboriously separating the legal wheat from the chaff and for the reasons that follow, the Court grants the motion in part and denies it in part.

## I.

Connearney has been a Registered Nurse ("RN") for over twenty-five years. (Compl. ¶ 13.) For the last fourteen years prior to her termination, she worked as an emergency room nurse for Lankenau. (*Id*. ¶¶ 12–13.) In January 2011, Kathleen Hogan ("Hogan") began serving as

---

[1] Lankenau is part of Main Line Hospitals, Inc., a network of hospitals and health centers in the Philadelphia area.

Lankenau's ER Nurse Manager.  (*Id.* ¶ 20.)  Connearney alleges that once Hogan became ER Nurse Manager, she "informed . . . people that she desired to replace the 'jaded' and higher paid night shift nurses with agency nurses." (*Id.* ¶ 21.)  Hogan believed those nurses to be callous and indifferent, and "frequently and publicly" stated that she was going to "roll that one out the door." (*Id.* ¶¶ 21–22.)

Connearney contends that Hogan was there to "clean house," and "rolled out the door" over thirty employees in her time as ER Nurse Manager.  (*Id.* ¶ 22–24.)  A number of employees were terminated, forced to resign or voluntarily quit because of the alleged harassment and toxic work environment.  (*Id.* at ¶¶ 25–26.)  Hogan "targeted" those employees who were over forty years old.  (*Id.*)  Connearney claims that Hogan was "aided and abetted" by two employees in the Human Resource ("HR") department, Gregory Papa ("Papa") and William Clifford ("Clifford"), who had direct knowledge of Hogan's conduct, but refused to fix the problem.  (*Id.* ¶ 27.) Connearney also alleges that the President of Lankenau, Phillip Robinson ("Robinson"), and the Vice President of Patient Care Services, Margaret Iacobacci ("Iacobacci"), "stood by and watched the Lankenau ER be decimated" by the acts of Hogan, Papa and Clifford.  (*Id.* ¶ 28.)

On July 7, 2014, Hogan "falsely accused" Connearney of insubordination.  (*Id.* ¶ 29.) The charge arose from an incident where another nurse at Lankenau made a "Great Catch," which Connearney defines as: "An event or circumstance that has the potential to cause an incident or critical incident but which did not actually occur due to corrective action and/or timely intervention."  (*Id.* ¶ 31.)  Pursuant to hospital procedure, Connearney filled out an incident report and placed a safety success story on the Safety Coach website the following day. (*Id.* ¶ 33.)  Hogan then contacted Connearney, told her that the post was inaccurate, and handed her an "Orange Performance Management Record that would have subjected [Connearney] to

immediate corrective intervention and/or termination." (*Id*. ¶ 35.) Connearney challenged the charge at a meeting with Papa and Hogan, and the Performance Management Record was downgraded from Orange to Yellow. (*Id*. ¶ 38.) Connearney alleges that Hogan's actions and motives were "defamatory and representative of evil motive." (*Id*. ¶ 40.)

On August 16, 2014, Connearney sent a letter to Papa and then acting Director of Nursing Frances Cusick ("Cusick"), reporting "the harassment, bullying, intimidation and hostile work environment."[2] (*Id*. ¶ 46.) Connearney requested that Papa and Cusick intervene, but no corrective action was taken. (*Id*. ¶¶ 46–47.) Also on August 16, Connearney was placed on medical leave by her physician, Joanne T. Lane, M.D. ("Dr. Lane"). (*Id*. ¶ 48.) As a result of Hogan's actions, Connearney developed chest pains, anxiety, heart palpitations, high blood pressure and depression. (*Id*. ¶¶ 51–53.) She was out of work from August 18, 2014 to September 2, 2014. (*Id*. ¶ 53.) When she returned to work, Connearney alleges that the harassment continued "with many late night calls" to her home. (*Id*. ¶¶ 54–55.)

Around 11:00 pm on November 26, 2014, Hogan called Connearney at her home. (*Id*. ¶ 56.) Hogan "told her not to report to work because there was a life threatening incident that had occurred on [Connearney's] prior shift on November 21, 2014." (*Id*.) On that call, Hogan refused to tell Connearney what had happened on November 21, but directed her to meet with Human Resources on December 1, 2014. (*Id*.) The incident prompting Hogan's phone call was Connearney's alleged falsification of medical records. (*Id*. ¶ 58.) The actual charge noted that Connearney "wrote on a patient's chart that she was given verbal orders from a physician for a patient to eat when in fact no verbal orders were ever given." (*Id*.) Connearney asserts that she

---

[2]     Connearney's complaint contains three pages of statements allegedly made by other Lankenau employees about Hogan. (*See* Compl. at 17–19.) Connearney fails to identify who actually made these statements or how they relate to Connearney.

was in fact given verbal orders by a doctor to allow the patient to eat and that Hogan "was wrongfully attempting to create a paper trail to justify [her] termination." (*Id*. ¶¶ 57, 59.)

Three days after the phone call, Connearney suffered "an emotional and physical breakdown" and was admitted to Bryn Mawr Hospital. (*Id*. ¶ 61.) She was released the following day. (*Id*. ¶ 62.) On December 1, 2014, Connearney's doctor "took her out of work until further notice," and she did not attend the meeting with Human Resources as Hogan had requested. (*Id*. ¶¶ 61–63.) Connearney contends that "at or about this time" she contacted Robinson, informed him of the actions of Hogan, Clifford and Papa, and requested that he intervene. (*Id*. ¶¶ 64–65.) No corrective action was taken. (*See generally id*.) Connearney remained on medical leave until January 15, 2015. (*Id*. ¶ 66.)

After serving jury duty on January 16, 2015, Connearney returned on January 17 to meet with Papa, Iacobacci and Cusick. (*Id*. ¶¶ 67–68.) Connearney was told that they were investigating the incident regarding the falsification of records, but "not . . . the multiple charges of bullying, intimidation and harassment at the hands of . . . Hogan." (*Id*. ¶ 68.) Connearney stated that she "would never again agree to be in the same room with . . . Hogan," and offered to switch positions and become a staff RN. (*Id*. ¶ 70.) Papa allegedly told Connearney that she had done a great job, was a team player and that she should leave the decision to them. (*Id*. ¶ 71.)

Papa called Connearney at home on January 20, 2015 to inform her that she was being fired for the falsification incident. (*Id*. ¶ 73.) The following day, Connearney was formally charged with "falsification of records." (*Id*. ¶ 74.) The charge stated:

> Christina wrote on a patient's chart that she was given verbal orders from a physician for a patient to eat when in fact no verbal orders were ever given. This could have caused harm to the patient because no medical screening was completed and a physician did not see the patient.

(*Id.*) Connearney argues that the charge was "completely false" because the patient "had been triaged and was not an [sic] emergency." (*Id.* ¶ 75.) She also contends that she had been given "verbal orders from a physician to permit the patient to eat." (*Id.*) She alleges that the patient was "being seen for repeat lab work," and was "stable, breathing fine, and had a normal pulse." (*Id.* ¶ 75.)

Connearney filed her seventeen count complaint on May 15, 2015. (ECF No. 1.) The Defendants filed their motion to dismiss on July 7, 2015. (ECF No. 4.) Connearney filed her response on July 21, 2015 (ECF No. 7.), and the Defendants filed their reply on July 28, 2015. (ECF No. 8.) Connearney then filed a sur-reply on August 5, 2015. (ECF No. 11.) The Court heard oral argument on the motion on November 19, 2015. (ECF No. 13.)

## II.

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead factual allegations sufficient "to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The "mere possibility of misconduct" is not enough. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* at 678. (quotation and citation omitted). Speculative and conclusory statements are not enough. "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions . . . a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

Furthermore, the court must construe the complaint in the light most favorable to the plaintiff. *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 314 (3d Cir. 2010) (quoting

*Gelman v. State Farm Mut. Auto. Ins. Co.*, 583 F.3d 187, 190 (3d Cir. 2009)).  However, while all allegations contained in the complaint must be accepted as true, the court need not give credence to mere "legal conclusions" couched as facts.  *Iqbal*, 556 U.S. at 678.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice."  *Id.*

Finally, a court should "consider only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim."  *Lum v. Bank of Am.*, 361 F.3d 217, 221 n.3 (3d Cir. 2004).  Whether a complaint states a plausible claim for relief is a context-specific task that "requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 556 U.S. at 679 (citation omitted).

## III.

Federal Rule of Civil Procedure 15(a) provides that, "courts may grant . . . amendments 'when justice so requires.'"  *Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 116 (3d Cir. 2003), *as amended* (Jan. 20, 2004) (citing Fed. R. Civ. P. 15(a)).  While Rule 15 states that "leave to amend should be 'freely given,' a district court has discretion to deny . . . amend[ment] if it is apparent from the record that . . . the amendment would be futile."  *Id.*; *see also Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002) (citing *Foman v. Davis*, 371 U.S. 178 (1962)).  The Third Circuit Court of Appeals has left the decision of whether to grant leave to amend within the sound discretion of the district court.  *See Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F.3d 267, 272 (3d Cir. 2001) (citations omitted).

"'Futility' means that the complaint, as amended, would fail to state a claim upon which relief could be granted."  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997) (citing *Glassman v. Computervision Corp.*, 90 F.3d 617, 623 (1st Cir. 1996) (internal

citations omitted)).  Thus, in assessing futility, the district court should apply "the same standard of legal sufficiency [that] applies under Rule 12(b)(6)."  *Id.*

## V.

### *Count I – Defamation*

Count I of Connearney's complaint alleges that all Defendants defamed her.  Under Pennsylvania law, Connearney must allege facts showing: (1) the defamatory character of the communication; (2) its publication by the defendant; (3) its application to the plaintiff; (4) the understanding by the recipient of its defamatory meaning; (5) the understanding by the recipient of it as intended to be applied to the plaintiff.  *See Tucker v. Fischbein*, 237 F.3d 275, 281 (3d Cir. 2001) (citing 42 Pa. Cons. Stat. Ann. § 8343(a)).  "A complaint for defamation must, on its face, identify exactly to whom the allegedly defamatory statements were made."  *Jaindl v. Mohr*, 637 A.2d 1353, 1358 (Pa. Super. Ct. 1994) *aff'd*, 661 A.2d 1362 (Pa. 1995) (referencing *Moses v. McWilliams*, 549 A.2d 950 (Pa. Super. Ct. 1988)); *see also Foster v. UPMC S. Side Hosp.*, 2 A.3d 655, 666 (Pa. Super. Ct. 2010) (finding complaint "fatally vague" where it failed to identify "who made the statements and to whom the statements were made").

Connearney's complaint is "fatally vague" because it does not identify "to whom the statements were made."  *See Foster*, 2 A.3d at 666.  Connearney identifies two defamatory statements:

> (a) the July, 2014 statement that [Connearney] failed to follow up a red rule violation and prepared an inaccurate Incident Report and Safety Success story on the Safety Coach website; and (b) the November, 2014 statement that [Connearney] falsified records in writing on a patient's chart that she was given a verbal order from a physician that the patient could eat.

(Compl. ¶ 96.)  Connearney alleges, in conclusory fashion, that "[p]ublication of [the] statements has been made by the Defendants to . . . potential employers in Philadelphia County . . . [and] in

the State of New Jersey." (*Id.* ¶ 99.)  There are a number of "potential employers" in Philadelphia County and the State of New Jersey, none of which are identified in Connearney's complaint as recipients of the allegedly defamatory statements.  Additionally, Connearney's contention that all seven Defendants published those defamatory statements is contradicted by her own complaint.  The only Defendant who allegedly published such statements was Hogan. (*Id.* ¶¶ 29, 33, 35, 56–58.)  Connearney fails however to allege to whom Hogan's statements were made.  Accordingly, Connearney fails to sufficiently allege a claim for defamation against any of the Defendants.

The Court is skeptical about the viability of a claim for defamation based on the factual predicates forming the basis of Connearney's complaint.  The Court is unaware of any judicial decisions, and Connearney has cited none, where an employee who disagreed with her employer's reasoning for terminating her subsequently prevailed on a defamation claim against the former employer.  However, the Court is unwilling at this juncture to conclude that amendment of Count I would be futile.  Connearney is granted leave to amend her defamation claim if she can allege specifically: (1) which Defendants published which statements; and (2) to whom those statements were published.

## *Count II – Civil Conspiracy to Deprive Civil Rights*

Count II alleges a claim against all Defendants for civil conspiracy to deprive her of her civil rights.  To establish a civil conspiracy, Connearney must allege facts showing "a combination or agreement between two or more persons to do an unlawful thing, or to do a lawful thing in an unlawful manner."  *Fife v. Great Atl. & Pac. Tea Co.*, 52 A.2d 24, 27 (Pa. 1947).  However, "[a] single entity cannot conspire with itself and, similarly, agents of a single entity cannot conspire among themselves."  *Rutherfoord v. Presbyterian-Univ. Hosp.*, 612 A.2d

500, 508 (Pa. Super. Ct. 1992); *see also Wells v. Thomas*, 569 F. Supp. 426 (E.D. Pa. 1983);

*O'Neill v. ARA Services, Inc.*, 457 F. Supp. 182 (E.D. Pa. 1978).  Connearney alleges a civil

conspiracy against MLH as an entity, and against the individual Defendants in their capacities as

*employees* of that entity.   (Compl. ¶¶ 4–9, 22–28.)  Because all Defendants are part of the same

entity, Connearney's civil conspiracy claim must fail.  Moreover, amendment to this part of

Count II would be futile as it is clear that Connearney's claims are premised on the individual

Defendants acting as employees.  Count II, insofar as it alleges a civil conspiracy, is dismissed.

Connearney's claim for deprivation of civil rights fails to allege which civil right was

deprived.  Connearney merely alleges that "Defendants . . . acted in agreement and conspired in

their efforts to unlawfully terminate . . . [her], and to deprive [her] of [her] lawful rights."

(Compl. ¶ 106.)  Even after Defendants noted this flaw, (*see* Def.'s Mot. Dis. at 10, ECF No. 4.),

Connearney failed to offer any civil right being deprived other than her "lawful rights."  (Pl.'s

Resp. at 9, ECF No. 7.)  A party cannot defend itself against a claim for civil rights violations

without knowing which right has allegedly been violated.  Because the Court cannot determine at

this juncture that amendment would be futile, Connearney is granted leave to amend Count II to

allege: (1) which civil right she was deprived of; and (2) which Defendant(s) deprived her of that

right.

## Count III – Breach of Contract

Count III alleges a claim for breach of contract against MLH.  Connearney alleges that

she was an at-will employee.  (Compl. ¶ 136.)  Pennsylvania courts have recognized that at-will

employees "may be discharged at any time, for any reason, [or] for no reason at all."  *Veno v.

Meredith*, 515 A.2d 571, 576 (Pa. Super. Ct. 1986) (quoting *Darlington v. General Electric*, 504

A.2d 306, 309–10 (Pa. Super. Ct. 1986)).  In order to overcome the at-will presumption,

Connearney would have to show that "both the employer and employee [intended] that a contract exist." *Rossi v. Sun Ref. & Mktg. Corp.*, No. CIV. A. 94–3037, 1995 WL 12056, at *5 (E.D. Pa. Jan. 11, 1995).

Connearney contends that MLH's handbook, and the policies and procedures contained therein, create an implied contract. (Compl. ¶¶ 84, 86–90, 116.) "In order for an employee handbook to constitute a contract, it must contain a clear indication that the employer intends to overcome the at-will presumption." *Raines v. Haverford Coll.*, 849 F. Supp. 1009, 1012 (E.D. Pa. 1994) (citing *Ruzicki v. Catholic Cemeteries Ass'n of Diocese of Pittsburgh*, 610 A.2d 495, 497 (Pa. Super. Ct. 1992)). Additionally, "a handbook is only enforceable as a contract if a reasonable person in the same position as the employee would interpret its provisions as evidencing an intent by the employer to overcome the at-will presumption." *Id.* "[I]t is for the court to determine whether the handbook contains any provisions indicating such an intent by the employer." *Id.*

Connearney failed to attach or reference any portions of the handbook which allegedly create an implied contract overcoming the at-will presumption. (*See generally* Compl.) She instead asks the Court to "permit the parties to conduct discovery to determine whether [MLH's] policies, procedures, and written communications to its employees sufficiently disclaimed any intent to create a contract." (Pl.'s Resp. at 10.) Connearney's complaint fails to allege any facts establishing: (1) the specific provisions she asks the Court to enforce; or (2) that MLH intended to "re-contract" with her by providing her with an employee handbook. *See Martin v. Capital Cities Media, Inc.*, 511 A.2d 830, 837 (Pa. Super. Ct. 1986). Because the viability of Connearney's breach of contract claim depends on information she is unsure exists, any amendment to Count III would be futile. Her breach of contract claim is accordingly dismissed.

*Count IV – Wrongful Discharge*

Count IV alleges a claim for wrongful discharge against MLH. To establish a claim for wrongful discharge in the at-will employment context, Connearney must show that her termination "threaten[ed] clear mandates of public policy." *Weaver v. Harpster*, 975 A.2d 555, 563 (Pa. 2009) (quoting *Clay v. Advanced Computer Applications, Inc.*, 559 A.2d 917, 918 (Pa. 1989)). Connearney "must do more than show a possible violation . . . that implicates only her own personal interest." *McLaughlin v. Gastrointestinal Specialists, Inc.*, 750 A.2d 283, 289 (Pa. 2000). Rather, she must show "that some public policy of this Commonwealth is implicated, undermined, or violated because of the employer's termination." *Id.* This exception is granted in "only the most limited of circumstances." *Weaver*, 975 A.2d at 563. Pennsylvania Courts have found a clear mandate of public policy threatened on very few occasions. *See, e.g.*, *Field v. Philadelphia Electric Co.*, 565 A.2d 1170 (Pa. Super. Ct. 1989) (plaintiff discharged after reporting nuclear safety violations); *Hunter v. Port Authority*, 419 A.2d 631 (Pa. Super. Ct. 1980) (plaintiff denied public employment on the basis of a prior conviction for which he had been pardoned); *Reuther v. Fowler & Williams, Inc.*, 386 A.2d 119 (Pa. Super. Ct. 1978) (plaintiff discharged for fulfilling jury duty).

Connearney alleges that her termination violated two policies of the Commonwealth: (1) the policy against bullying; and (2) the policy against terminating employees who comply with their duties under the Pennsylvania Medical Care Availability and Reduction of Error Act ("MCARE Act"), 40 Pa. Cons. Stat. Ann. § 1303.101. Connearney cannot point to a single case in which the at-will employment exception was invoked to protect either of these policies. She also fails to point to any authority which establishes that the Commonwealth has even adopted these policies. The Court will not extend such a "limited" exception on the facts alleged in

Connearney's complaint, and any amendment would be futile. Connearney's wrongful discharge claim is dismissed.

## Count V – Bullying

Count V alleges a claim for "bullying" against all Defendants. Connearney correctly notes that there are no cases "finding an independent cause of action for bullying under common law." (Pl.'s Resp. at 12.) She nevertheless states that "it is time for the Courts to recognize that bullying and employee abuse constitute an exception to at-will employment." (*Id*.) The Court will not create a common law cause of action in Pennsylvania for bullying however Connearney may want to define (or redefine) that term, and any amendment would be futile. Count V of Connearney's complaint is dismissed.

## Count VI – Retaliation

Count VI alleges a claim for retaliation against all Defendants. Like her bullying claim, Connearney's retaliation claim is not recognized as an independent cause of action under either federal or Pennsylvania law. Federal law provides a number of ways by which employees like Connearney can assert causes of action for retaliatory treatment or termination. Connearney is granted leave to amend Count VI to allege a claim for retaliation pursuant to the appropriate statute. Additionally, she is directed to specify the Defendants against whom she is alleging retaliation.

## Count VII – Constructive Discharge

Count VII alleges a claim for constructive discharge against all Defendants. Constructive discharge "occurs . . . where the employer makes working conditions so intolerable that the employee is forced to resign." *Pennsylvania Labor Relations Bd. v. Sand's Rest. Corp.*, 240 A.2d 801, 803 (Pa. 1968). Connearney specifically alleges that she was terminated. (Compl. ¶¶

73–74.)  At oral argument however, Connearney's counsel disagreed.  He instead stated that "[s]he was informed she was fired."  (Oral Arg. 37:1–2.)  When pressed on the difference between being fired and being informed she was fired, counsel stated "[s]he was terminated." (*Id*. at 37:11–14.)  Based on Connearney's own allegations, she was terminated and thus could not have been constructively discharged.  Connearney's constructive discharge claim is dismissed.

*Count VIII – Assault*

Count VIII of Connearney's complaint contends that Hogan, Papa, Clifford and MLH assaulted her.  To establish an assault claim, Connearney must show: "(1) 'one acts with the unprivileged intent to put another in reasonable and immediate apprehension of harmful or offensive conduct'; and (2) that act 'does cause such apprehension.'"  *Plaza-Bonilla v. Cortazzo*, No. CIV. A. 07–2045, 2009 WL 605909, at *9 (E.D. Pa. Mar. 9, 2009) (citing *Proudfoot v. Williams*, 803 F. Supp. 1048, 1054 (E.D. Pa. 1992)).  "Words in themselves, no matter how threatening, do not constitute an assault; the actor must be in a position to carry out the threat immediately, and he must take some affirmative action to do so."  *Regan v. Upper Darby Twp.*, 363 F. App'x 917, 921 (3d Cir. 2010) (quoting *Cucinotti v. Ortmann*, 159 A.2d 216, 217 (Pa. 1960)).  Therefore, "[t]hreatening words alone are deemed insufficient in this jurisdiction to put a person in reasonable apprehension of physical injury or offensive touching."  *Id*. (quoting *Cucinotti*, 159 A.2d at 218).

Connearney alleges that "Hogan . . . would get in [her] face, while shouting, screaming and threatening [her], to the extent that [she] reasonably feared and apprehended the infliction of physical injury."  (Compl. ¶ 152.)  Setting aside the conclusory allegation that she "reasonably feared and apprehended" harmful or offensive conduct, Connearney fails to allege *facts* showing

that Hogan took any affirmative act to carry out her threats.  *See Regan*, 363 F. App'x at 921

(quoting *Cucinotti*, 159 A.2d at 217).  Simply yelling in someone's face cannot constitute

assault.  Moreover, Connearney fails to allege any facts establishing how Papa, Clifford and

MLH could be held liable for assault.  (*See generally* Compl.)

Connearney contends that *Brame v. Laborers' Dist. Council Health & Welfare Fund*, No.

CIV. A. 89–0745, 1989 WL 95225 (E.D. Pa. Aug. 11, 1989) is analogous to this case.  In *Brame*,

the defendant pulled out a "silver object with a sharp point, looked at [plaintiff] in a threatening

manner, and said to her: 'Do you see this, do you see this . . . If you do anything to jeopardize

my job or my home life I will slit your throat with this.'"  *Brame*, 1989 WL 95225, at *5.

Connearney's allegations fall far short of those in *Brame*.  Connearney may attempt to amend her

assault claim if she can plead *facts* establishing that Hogan took actions, other than shouting or

screaming at her, that placed Connearney in reasonable and immediate apprehension of harmful

or offensive conduct.  Also, if she has the factual and legal bases to do so, Connearney may

amend to allege how Papa, Clifford and MLH could be liable for assault.

## Count IX – Intentional Infliction of Emotional Distress

Count IX alleges a claim of intentional infliction of emotional distress ("IIED") against

all Defendants.  Under Pennsylvania law the elements of a claim of IIED are: "(1) the conduct

[of the defendant] must be extreme and outrageous; (2) it must be intentional or reckless; (3) it

must cause emotional distress; [and] (4) that distress must be severe."  *Hoy v. Angelone*, 691

A.2d 476, 482 (Pa. Super. Ct. 1997), *aff'd* 720 A.2d 745 (Pa. 1998).  Stating a claim of IIED also

requires an allegation of some sort of physical injury, harm or illness related to the distress.

*Corbett v. Morgenstern*, 934 F. Supp. 680, 684 (E.D. Pa. 1996) (citations omitted).  The Court

must determine, as an initial matter, if the Defendants' conduct is so extreme and outrageous to

permit recovery.  *See Cox v. Keystone Carbon Co.*, 861 F.2d 390, 395 (3d Cir. 1988).  However, "[i]t is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress."  *Id*.  Only "the most clearly desperate and ultra extreme conduct" will support an IIED claim under Pennsylvania law.  *Hoy*, 720 A.2d at 754.

Connearney contends that Defendants "terminat[ed] [her] on pretextual charges in retaliation for her reports" of bullying, harassment, a hostile work environment, and age discrimination.  (Pl.'s Resp. at 17.)  The only instance in which Pennsylvania courts have found retaliatory termination sufficient to support a claim for IIED, is "where an employer engaged in both sexual harassment and other retaliatory behavior against an employee."  *Imboden v. Chowns Commc'ns*, 182 F. Supp. 2d 453, 457 (E.D. Pa. 2002) (citing *Cox*, 861 F.2d at 395).  Even in those circumstances, "[t]he extra factor that is generally required is retaliation for turning down sexual propositions."  *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1487 (3d Cir. 1990).  Specifically in the employment context, Connearney's complaint fails to allege "the most clearly desperate and ultra extreme conduct" required to support an IIED claim under Pennsylvania law.  *Hoy*, 720 A.2d at 754.  As any amendment would be futile, Connearney's claim for IIED is dismissed.

### Count X – Pennsylvania Whistleblower Law

Count X alleges a violation of the Pennsylvania Whistleblower Law, 43 Pa. Const. Stat. Ann. § 1421 *et. seq.*, against all Defendants.  Defendants contend that they cannot be held liable under the law because they are not a "public body."  (Def.'s Mot. Dis. at 16–17.)  The Whistleblower Law makes it unlawful for an employer to "discharge, threaten or otherwise discriminate or retaliate against an employee . . . because the employee . . . makes a good faith

report . . . to the employer or appropriate authority [of] an instance of wrongdoing or waste."
*Denton v. Silver Stream Nursing & Rehab. Ctr.*, 739 A.2d 571, 575 (Pa. Super. Ct. 1999) (citing
43 Pa. Const. Stat. Ann. § 1423(a)).  "Employer" is defined, in relevant part, as "[a] public body
or [an individual] [who] receives money from a public body to perform work or provide
services."  43 Pa. Cons. Stat. Ann. § 1422.  A "public body" is further defined as, "any body
created by the Commonwealth or 'which is funded in any amount by or through Commonwealth
or political subdivision authority or a member or employee of that body.'"  *Denton*, 739 A.2d at
575–576.

Facing an issue of first impression, the Pennsylvania Superior Court in *Denton* addressed
whether a defendant hospital's receipt of Medicaid funds through the state qualified it as a
"public body" for purposes of the Whistleblower Law.  *Id.*  The *Denton* court found that "[t]he
statute plainly and unequivocally makes any body 'funded in any amount by or through
Commonwealth . . . authority' a public body for purposes of the Whistleblower Law."  *Id.* at 576
(citing *Riggio v. Burns*, 711 A.2d 497 (Pa. Super. 1998) (*en banc*) (internal citations omitted)).
Referencing the law's "by or through" language, the Superior Court reasoned that "[t]he Law
clearly indicates that it is intended to be applied to bodies that receive not only money
appropriated *by* the Commonwealth, but also public money that passes *through* the
Commonwealth."  *Id.* (emphasis in original).  The court therefore found that "a recipient of
Medicaid funding is a 'public body' for purposes of the Whistleblower Law."  *Id.*

Connearney alleges that the Defendants fired her in retaliation for her reporting of their
wrongdoing and violations of a number of Pennsylvania statutes and regulations.  (Compl. ¶
170.)  Connearney contends that MLH "is funded through the federal and state government,
which fund Medicare and Medicaid, and, to a lesser degree, state governments including the

16

Commonwealth of Pennsylvania." (*Id.* ¶ 163.)  Connearney thus alleges that MLH is a recipient of Medicaid funding.  She has therefore sufficiently alleged that MLH is a public body subject to liability under the Whistleblower Law.

The issue then becomes whether Connearney's Whistleblower claim can be brought against her individual supervisors.  The Whistleblower Law allows an individual "[who] receives money from a public body to perform work or provide services" to be held liable.  43 Pa. Cons. Stat. Ann. § 1422; *see also Rankin v. City of Philadelphia*, 963 F. Supp. 463, 468 (E.D. Pa. 1997).  Connearney alleges that Hogan, Papa, Clifford, Robinson and Iacobacci all worked in some supervisory capacity for MLH.  (*Id.* ¶¶ 4–9, 22–28.)  Inasmuch as MLH could constitute a public body, Connearney's supervisors may fall under the definition of employer as those who "receive[] money from a public body to perform work or provide services."  43 Pa. Cons. Stat. Ann. § 1422.  Additionally, Connearney alleges that all Defendants fired her in retaliation for her reports of wrongdoing.  (Compl. ¶ 170.)  Whether Connearney can prove that all seven Defendants fired her for reporting wrongdoing is not the issue before the Court at this stage.  For the purposes of defeating a motion to dismiss brought under Rule 12(b)(6), Connearney has sufficiently alleged that her individual supervisors could be held liable under the Pennsylvania Whistleblower Law.  Defendants' motion to dismiss Count X of Connearney's complaint is denied.

## Count XI – ERISA § 510

Count XI alleges a violation of Section 510 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et. seq.*, against all Defendants.  Section 510 of ERISA "prohibits employer conduct taken against an employee who participates in a pension benefit plan for 'the purpose of interfering with the attainment of any right to which such

participant may become entitled under the plan.'" *Gavalik v. Cont'l Can Co.*, 812 F.2d 834, 851 (3d Cir. 1987) (citing 29 U.S.C. § 1140).  To establish a violation of § 510, Connearney must accordingly show: "(1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled." *Id*. at 852 (citing 29 U.S.C. § 1140).  The essential element for an employee to establish in a § 510 claim is that the employer acted with the specific intent to interfere with the employee's right.  *See Id*.  In most cases however, "specific intent . . . will not be demonstrated by 'smoking gun' evidence." *Id*. at 852.  As a result, employees can establish that the employer acted with specific intent through the use of circumstantial evidence.  *See Id*.  Additionally, individuals can be held liable for violating ERISA § 510.  *See, e.g.*, *Garson v. HVAC Corp.*, No. CIV. A. 10–1612, 2010 WL 4484634, at *5 (E.D. Pa. Nov. 8, 2010) (noting how ERISA defines both "employer" and "person" for purposes of establishing liability).

Connearney alleges that her discharge was in substantial part motivated by a desire and concerted effort to prevent employees from maintaining ERISA benefits.  (Compl. ¶ 176.)  She also contends that older employees were terminated and then replaced by younger employees who cost the company less in terms of health and other employee benefits to reduce MLH's healthcare and pension responsibilities.  (*Id*. at ¶ 177.)  Additionally, Connearney contends that she was entitled to enjoy participant status in ERISA protected programs.  (*Id*. at ¶ 178.)  Again, whether Connearney can *prove* that all seven Defendants acted with the specific intent to deny her ERISA protected benefits is not the issue at this juncture.  Connearney has sufficiently alleged that Defendants terminated her with the intent to deny her ERISA protected benefits to which she was entitled.  Defendants' motion to dismiss Count XI is denied.

*Count XII – Negligence*

Count XII alleges negligence against all Defendants.  To establish a claim of negligence, Connearney must show: "(1) a duty or obligation recognized by the law requiring the defendant[s] to conform to a certain standard of conduct for the protection of others against unreasonable risks; (2) defendant[s'] failure to conform to the standard required; (3) a causal connection between the conduct and the resulting injury; (4) actual loss or damage resulting to [Connearney]."  *Stellar v. Allied Signal, Inc.*, 98 F. Supp. 3d 790, 798 (E.D. Pa. 2015) (citing *R.W. v. Manzek*, 888 A.2d 740, 746 (Pa. 2005)).  "Whether a defendant owes a duty of care to a plaintiff is a question of law in Pennsylvania."  *Id.* (citing *Kleinknecht v. Gettysburg Coll.*, 989 F.2d 1360, 1366 (3d Cir. 1993)).

Connearney alleges that "Defendants owed a duty or [sic] reasonable care to all employees and [to her] to provide a workplace free from bullying, intimidation, and abusive conduct of its supervisors and managers."  (Compl. ¶ 183.)  In certain circumstances, Pennsylvania courts have adopted an employer's common law duty to exercise reasonable care in providing a safe workplace.  *See, e.g.*, *Stellar*, 98 F. Supp. 3d at 798 (finding that a collective bargaining agreement did not preempt an employee's negligence claim against an employer for failure to provide a workplace free from asbestos).  The Court is unaware of any cases extending this duty to require an employer to provide a workplace free from bullying and intimidation.  At oral argument counsel argued that "if [it] were to be determined that numerous employees were driven to seek psychiatric help . . . [this] case may get a little bit closer to the asbestosis type of situation."  (Oral Arg. 107:16–21.)  The Court disagrees.  Connearney's negligence claim is dismissed.

*Counts XIII and XIV – Violation of the FMLA*

Count XIII alleges a violation of the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2611 *et. seq.*, against Lankenau.  The allegations fail to specify whether Connearney's claims are brought under a theory of interference or retaliation.  At oral argument, Connearney's counsel was asked which theory his client was pursuing.  (Oral Arg. 60:6–8.)  He responded by saying, "[i]t may be a combination of both."  (*Id*. at 60:9–10.)  It is not the Court's responsibility to divine under which theory Connearney's FMLA claims will proceed.  She is therefore granted leave to amend Count XIII to specify which type of FMLA claim she is alleging against Lankenau and to allege facts which support interference and/or retaliation under the statute.

Count XIV is a claim for declaratory relief in the form of compensatory damages under the FMLA.  Count XIV simply repeats the requested relief in Count XIII and cannot stand alone as an individual cause of action.  *See generally* 29 U.S.C. § 2617 (conditioning the receipt of compensatory damages on a finding of liability under 29 U.S.C. § 2615).  Accordingly, Connearney is directed to combine Counts XIII and XIV into a single cause of action under the FMLA.

*Count XV – Age Discrimination*

Count XV alleges a claim for age discrimination against Lankenau under the Age Discrimination in Employment Act of 1967 ("ADEA"), 42 U.S.C. § 2000e *et. seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. Ann. § 951 *et. seq.*[3]  To establish a *prima facie* claim under the ADEA, Connearney must show: (1) she is forty years of age or older; (2) Lankenau took an adverse employment action against her; (3) she was qualified

---

[3]     Claims of age discrimination under the ADEA and PHRA are analyzed similarly.  *See Connors v. Chrysler Fin. Corp.*, 160 F.3d 971, 972 (3d Cir. 1998).

for the position at issue; and (4) she was replaced by someone sufficiently younger to support an inference of discriminatory animus.  *See Cridland v. Kmart Corp.*, 929 F. Supp. 2d 377, 385 (E.D. Pa. 2013).

Connearney alleges that she was forty-seven years old at the time she was terminated. (Compl. ¶ 211.)  She also contends that her performance at work was well-respected by her fellow co-workers.  (*Id.* ¶¶ 14–18, 207, 210.)  Connearney clearly suffered an adverse employment action through her termination.  (*Id.* ¶ 73–74, 208.)  Finally, Connearney alleges that she was terminated in an effort to purge veterans from the ER.  (*Id.* ¶ 79, 208, 212–213.) She contends these actions were motivated by Hogan's desire to "roll the jaded nurses out the door."  (*Id.*)  In their place, Connearney alleges that Defendants turned over her job duties and responsibilities to substantially younger employees.  (*Id.*)  While Connearney's "substantially younger" allegation is conclusory, when taken in context with the rest of her allegations, she has sufficiently pled a *prima facie* case of age discrimination under the ADEA.  Defendants' motion to dismiss Count XV of Connearney's complaint is therefore denied.

### Count XVI – Aiding and Abetting Age Discrimination

Count XVI asserts that Hogan, Robinson, Papa, Clifford and Iacobacci aided and abetted age discrimination under the PHRA.  Section 955(e) of the PHRA makes it unlawful for:

> [A]ny person, employer . . . or employee, to aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice, or to obstruct or prevent any person from complying with the provisions of this act or any order issued thereunder, or to attempt, directly or indirectly, to commit any act declared by this section to be an unlawful discriminatory practice.

43 Pa. Cons. Stat. Ann. § 955(e).  Thus, "an individual supervisory employee can be held liable under an aiding and abetting/accomplice liability theory pursuant to § 955(e) for his own direct acts of discrimination or for his failure to take action to prevent further discrimination by an

employee under supervision." *Davis v. Levy, Angstreich, Finney, Baldante, Rubenstein & Coren P.C.*, 20 F. Supp. 2d 885, 887 (E.D. Pa. 1998).  However, this liability only extends to those who are in a supervisory role.  *Id*.

Connearney alleges that Hogan, Robinson, Papa, Clifford and Iacobacci all either engaged in age discrimination, or failed to take corrective action to stop reports of age discrimination.  (*See, e.g.*, Compl. ¶¶ 22–28.)  Additionally, Connearney alleges that all of these employees worked in some supervisory capacity.  (*Id*. ¶¶ 4–9, 22–28.)  Connearney has sufficiently alleged a claim for aiding and abetting age discrimination under the PHRA and Defendants' motion to dismiss this Count is denied.

Count XVII – Disability Discrimination

Count XVII alleges a claim against Lankenau for disability discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12111 *et. seq*.  At the time she filed her complaint, Connearney had not exhausted her administrative remedies as required by the ADA.  However, 180 days have now passed since the filing of her EEOC complaint[4] and an analysis of Connearney's ADA claim is appropriate.  To establish a *prima facie* case of disability discrimination, Connearney must show: (1) she is a disabled person within the meaning of the ADA; (2) she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) she has suffered an otherwise adverse employment decision as a result of discrimination.  *See Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999).  The Act defines a disability as either: "(A) a physical or mental

---

[4]        The EEOC provides, in relevant part, that a plaintiff  may commence a civil action against her employer 180 days after the filing of her administrative complaint.  *See generally Occidental Life Ins. Co. of California v. E.E.O.C.*, 432 U.S. 355 (1977).  Connearney filed her complaint with the EEOC on May 7, 2015. (Pl.'s Resp. at 25.) The 180 day administrative period expired on November 3, 2015.  Defendants filed their motion to dismiss before the administrative period ended, and therefore did not brief Connearney's ADA claim.  Connearney's ADA claim, for the reasons described, is insufficient.

impairment that substantially limits one or more of the major life activities of [an] individual ["actual disability"]; (B) a record of such an impairment; or (C) being regarded as having such an impairment." *Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751, 762 (3d Cir. 2004) (citing 42 U.S.C. § 12102(2)).

Connearney does not allege that she suffers from a disability under the ADA. She merely contends that she "suffer[ed] a physical and mental impairment that substantially limited a major activity or was perceived to have such a disability." (Compl. ¶ 224.) Connearney's "formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Connearney is given leave to amend her complaint if she can sufficiently allege facts establishing a *prima facie* case of disability discrimination.

BY THE COURT:

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.