**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

CHRISTINA K. CONNEARNEY,

        *Plaintiff*,

    v.

MAIN LINE HOSPITALS, INC. *et al.*,

        *Defendants*.

CIVIL ACTION
No. 15-02730

**PAPPERT, J.**                                            **October 28, 2016**

**MEMORANDUM**

Christina Connearney has been a nurse for more than twenty years.  She worked for Lankenau Medical Center from 2001 to January of 2015, when she was fired for allegedly falsifying medical records.  For approximately the last five years of her employment at Lankenau, Connearney worked under nurse manager Kathleen Hogan.  Connearney's Amended Complaint alleges that Lankenau, its parent company Main Line Hospitals, Hogan and a number of Lankenau employees (collectively "Defendants") violated the Age Discrimination and Employment Act (Counts I & III), the Americans with Disabilities Act (Counts II & III), the Family and Medical Leave Act (Count IV), the Pennsylvania Human Relations Act (Counts I, III & VI) Pennsylvania's Whistleblower law (Count VII) and Pennsylvania common law (Count X).[1]

Before the Court is Defendants' Motion for Summary Judgment.  After reviewing the parties' briefs, holding oral argument on the motion and thoroughly reviewing the record, the

---

[1]      Connearney filed her original complaint on May 15, 2015.  (ECF No. 1.)  Defendants filed a motion to dismiss on July 7, 2015.  (ECF No. 4.)  The Court granted the Defendant's motion in part, dismissing some claims with prejudice and allowing Connearney to amend others.  (ECF No. 16.)  Connearney filed her amended complaint on January 25, 2016.  (ECF No. 18.)  Defendants filed this motion for summary judgment on August 22, 2016. (ECF No. 40.)  Connearney responded to the motion on September 20, 2016, in which she withdrew two of her claims.  (ECF No. 49.)

Court denies the motion with respect to Count I, Count VI as to Hogan and Count X and grants the motion with respect to Counts II, III, IV, and VII.

## I.

Defendants hired Connearney as a staff nurse in 2001. (Connearney Dec. ¶ 1.) After two years, Connearney was promoted to a weekend clinical lead position where she worked as a member of management. (*Id.* ¶ 3.) In 2010 Defendants hired Hogan as a nurse manager, in which capacity she became Connearney's direct supervisor. (*Id.* ¶ 6.) Connearney admits that she got along "fairly well" with Hogan for the first two years. (Connearney Dec. ¶ 9.)

In January 2013 Connearney was promoted to a full time clinical coordinator position. (*Id.* ¶ 14.) Two-weeks after her promotion, Hogan told Connearney that she should have fired her and the relationship between the two deteriorated from there. (*Id.* 17:6–7, 6:22, 18:18–19:1.) Hogan also denied Connearney's vacation requests or "lost" those requests on multiple occasions. (*Id.* 19:8–9, 20:5, Connearney Dec. ¶ 15.) Connearney and several of her coworkers began to feel that Hogan was unfairly targeting the older nurses in the department. The essence of their complaints was that Hogan not only made many negative comments about older nurses, but also bullied, harassed and intimidated them into resigning. If that failed, Hogan scrutinized the employees more closely in an effort to build a record upon which she could terminate them.

On August 16, 2014 Connearney wrote a letter to Greg Papa, Lankenau's director of human resources. (Pl.'s Ex. DD.) In this letter she voiced her concerns about Hogan's bullying, harassment and creation of a hostile work environment. (*Id.*) Connearney also requested a transfer to a different hospital. (*Id.*) Connearney then began experiencing chest pains, which she attributed to the environment at work, specifically Hogan's behavior. (*Id.* ¶ 36.) She met with her personal physician on August 18, 2014 at which time the doctor recommended Connearney

take two weeks off from work.  (*Id.* ¶ 37.)  Connearney returned to work on September 1.  On September 4, she met with Margaret Iacobacci, vice president of patient care services, director of nursing Francis Cusick and Papa to discuss the concerns she raised in her August 16 letter to Papa.  (*Id.* ¶ 39.)  Iacobacci and Cusick told Connearney that she could not transfer to another hospital and retain her title and benefits; she could, however, move from her clinical coordinator position to a staff nurse role and not report to Hogan directly.  (*Id.* ¶ 42.)  Connearney agreed, and the move was effective September 28, 2014.  (*Id.* ¶ 45.)

In October 2014 Connearney received from Hogan the worst performance review of Connearney's career.[2]  (*Id.* ¶ 46.)  Connearney refused to sign the review, and instead e-mailed Iacobacci, Cusick and Papa on October 27, 2014.  (*Id.* ¶ 48.)  On November 9 Connearney also emailed Philip Robinson, the president of Lankenau, to express her concerns about Hogan.  (*Id.* ¶ 50.)  Connearney then met with Papa, Iacobacci and Cusick on November 12, who told Connearney they were continuing to review her complaints about Hogan.  (*Id.* ¶ 51.)

Connearney worked the November 20–21, 2014 overnight shift.  (Def.'s SOF ¶ 12.) Around midnight, a quadriplegic patient was admitted to Lankenau.  The patient was hungry and wanted to order buffalo wings from Dominos.  Due to his disability, he needed help placing the order.  (Connearney Dec. ¶ 53.)  Connearney ordered the wings at 12:20 a.m. and documented in the patient's chart: "PT ordered buffalo wings Domino 0020."  (Def.'s SOF ¶ 18.)  Connearney says Dr. John Barry gave her permission to order the food, even though she did not need permission to order food for a patient; she only needed permission to allow the patient to actually eat.  (Connearney Dec. ¶ 54, 56.)  Dr. Barry did not remember Connearney asking for his permission, but acknowledged it was possible.  (Barry Dep., at 103:18–24.)

---

[2]     Although Hogan did not directly supervise Connearney, she still worked below Hogan and was subject to performance reviews by her.

The wings were delivered to the patient's room shortly before Dr. Melissa Barenbaum entered the room to assess the patient.  Defendants contend that the patient had already begun to eat the wings at this time, but Connearney says otherwise.[3]  Connearney claims that she first asked Barenbaum if it was okay for the patient to eat after Barenbaum had evaluated the patient. (Connearney Dec. ¶ 57.)  According to Connearney, Barenbaum said yes.  (*Id.*)  Barenbaum does not remember if, after her assessment of the patient, she allowed the patient to eat the buffalo wings.  (Barenbaum Dep., at 127:24.)

Meanwhile, Marc Baron, who was supervising Connearney that evening in his role as clinical coordinator, asked her why she had written "PT ordered buffalo wings Domino 0020" on the patient's chart.  Connearney, in response, says she confirmed with Barenbaum, loud enough for Baron to hear, that the patient could eat the food.  (Connearney Dec. ¶ 60.)  Connearney then wrote on the chart, above her previous notation, "V.O. Dr. Barenbaum / CC," indicating that Barenbaum had given a verbal order that the patient could eat.  (*Id.*, Def.'s SOF ¶ 19.) Defendants challenge this order of events.  They contend Connearney altered the medical chart prior to getting approval from Barenbaum. (Tr. of Oral Arg., at 66:19–67:2.)[4]  Barenbaum spoke with Connearney before the end of her shift.  (Connearney Dec. ¶ 62, Barenbaum Dep., at 183:6– 185:24.)  Barenbaum said she was not happy with how Connearney recorded the event in the chart because it made it look as if Barenbaum had ordered buffalo wings for a patient. (Barenbaum Dep., at 185:11–22.)

---

[3]     Barenbaum testified that she remembered seeing a box of wings next to the patient when she first walked into the room.  (Barenbaum Dep., at 124:10–24.)  She said it "seemed as though" Connearney was letting the patient eat, but she was not certain.  (*Id.*)

[4]     At oral argument, Defendants said Barenbaum testified that the verbal order was already marked in the chart before she entered the room.  The Court found no such testimony in the record.  Barenbaum testified that the entry was "timed before I even saw—I even knew the patient—existed, so I couldn't have given a verbal order before I even saw a patient."  (Barenbaum Dep., at 205:4-13.)  This, however, is consistent with Connearney's claim that she wrote "V.O. Dr. Barenbaum / CC" above the original entry "PT ordered buffalo wings Domino 0020" after Barenbaum examined the patient.

Later that morning Baron sent an email to Hogan describing this incident.  (Def.'s SOF ¶ 13, Def.'s Ex. A-5.)   In his email, Baron says that Barenbaum came to him with a concern about how Connearney documented the food order.  (Def.'s Ex. A-5.)  Baron also notes in his email that Connearney asked Barenbaum at approximately 1:30 a.m. if the patient could eat, and that after her evaluation Barenbaum gave approval for the patient to do so.  (*Id.*)  Barenbaum testified that she never spoke to Baron, but that he instead overheard her and Connearney discussing the incident.  (Barenbaum Dep., at 192:4–10.)

After receiving Baron's email, Hogan reported the incident to Papa and Cusick.  (Def.'s SOF ¶ 21.)  Hogan told them Barenbaum approached her the morning after the incident.  (*Id.*)  Hogan said Barenbaum spoke with her for about ten minutes.  (*Id.* at 373:18–24, 374:3–4.)  Barenbaum's testimony, however, contradicts this account.  Barenbaum testified that Hogan approached her days after the incident, spoke to her for about a minute and did not discuss the charting of the food.  (Barenbaum Dep., at 193:10–12, 196:15–16.)  Barenbaum says that Hogan's focus was really on Connearney's ordering of wings and not how the event was recorded. (*Id.* at 197:3–6, 193:23–194:2.)

Papa instructed Hogan to remove Connearney from the schedule pending a fuller investigation into the events.  (Hogan Dep., at 380:24–381:3.)  Hogan told Connearney not to report to work but instead meet with human resources on December 1. (Connearney Dec. ¶ 63.)  Connearney then suffered a "physical and mental breakdown" and admitted herself to the hospital for chest pains on November 30.  (*Id.* ¶ 65.)  Connearney met with her doctor the next day.  She did not meet with human resources, but instead took FMLA leave from December 1, 2014 until January 14, 2015.  (*Id.* ¶ 66, Def.'s SOF ¶ 35, Connearney Dep. I, at 135:24–136:5,

Pl's Ex. EEE.)  On January 16, 2014 Connearney met with Papa, Cusick and Hogan to discuss the incident.  (Def.'s SOF ¶ 36.)  Defendants fired Connearney on January 21, 2015.  (*Id.* ¶ 6.)

## II.

Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law.  *Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc. Emp. Health & Welfare Plan*, 298 F.3d 191, 194 (3d Cir. 2002); *see also* Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists when "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).  A mere scintilla of evidence in support of the non-moving party will not suffice; there must be evidence by which a jury could reasonably find for the non-moving party.  *Id.* at 252.  Summary judgment is appropriate where "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In reviewing the record, a court "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Prowel v. Wise Bus. Forms*, 579 F.3d 285, 286 (3d Cir. 2009). The court may not, however, make credibility determinations or weigh the evidence in considering motions for summary judgment. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

## III.

Connearney's claims of discrimination and retaliation under the Age Discrimination and Employment Act ("ADEA"), Americans with Disabilities Act ("ADA") and the Family and

Medical Leave Act ("FMLA") must be evaluated under the burden shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Connearney must therefore first establish a *prima facie* case of discrimination or retaliation.  If she does so, the Defendants must articulate a legitimate nondiscriminatory reason for her termination.  If Defendants provide such a reason, the burden shifts back to Connearney to establish by a preponderance of the evidence that Defendants' stated reason is pretextual.  *See Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 326 (3d Cir. 2015).

## A.

Count I alleges a claim for (i) disparate treatment and (ii) hostile work environment against Lankenau under the ADEA, 42 U.S.C. § 2000e *et. seq.*, and the PHRA, 43 Pa. Cons. Stat. § 951 *et. seq.*[5] *See* (Tr. of Oral Arg., at 52:10–53:7).

### i.

To establish a *prima facie* claim of disparate treatment under the ADEA, Connearney must show: (1) she is forty years of age or older; (2) Lankenau took an adverse employment action against her; (3) she was qualified for the position; and (4) she was replaced by someone sufficiently younger to support an inference of discriminatory animus.  *See Smith v. City of Allentown*, 589 F.3d 684, 689 (3d Cir. 2009).  Connearney has established a *prima facie* case of age discrimination.  The requirement to make out a *prima facie* case is not intended to be onerous.  *See Sempier v. Johnson & Higgins*, 45 F.3d 724, 729 (3d Cir. 1995) (quoting *Furnco Constr. Co. v. Waters*, 438 U.S. 567, 577 (1978) (quotations omitted)).  Defendants do not dispute that she has satisfied the first three elements—she was 45 years old when she was

---

[5]        Claims of age discrimination under the ADEA and PHRA are analyzed similarly.  *See Connors v. Chrysler Fin. Corp.*, 160 F.3d 971, 972 (3d Cir. 1998).

terminated and was qualified for the position—but argue she has failed to satisfy the fourth prong.

The Third Circuit Court of Appeals has stated that there is "no particular age difference that must be shown" in order to satisfy this fourth element. *Showalter v. Univ. of Pitt. Med. Ctr.*, 190 F.3d 231, 237 (3d Cir. 1999) (quoting *Sempier*, 45 F.3d at 729). "Different courts have held, for instance, that a five year difference can be sufficient, but that a one year difference cannot." *Sempier*, 45 F.3d at 729; *see also Showalter*, 190 F.3d at 236. In *Sempier*, the Third Circuit held that the fourth prong was satisfied where two individuals, one four years younger and another ten years younger, replaced the plaintiff. *Id.* at 730. The Third Circuit has also considered the average age difference of those workers who assumed plaintiff's job duties. *Steward v. Sears Roebuck & Co.*, 231 F. App'x 201, 209 (3d Cir. 2007).

In the four months after Connearney's termination at age 45, Defendants hired four nurses. (Def.'s Ex. A-26.) The first, a weekend staff nurse, was 31 years old. The next three hires were staff nurses who were 39, 43 and 48 years old. The average age of these new hires is approximately 40 years old, five years younger than Connearney, the same age difference the Third Circuit has recognized in *Sempier* and *Showalter* to be sufficient. *See Sempier*, 45 F.3d at 729; *Showalter*, 190 F.3d at 236.

The Defendants' burden of articulating a nondiscriminatory reason is "relatively light" and is satisfied "if the employer provides evidence, which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason." *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013) (quoting *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006) (internal quotations omitted)). Defendants contend that Connearney was terminated because she falsified medical records. They have attached as exhibits a performance

management record indicating Connearney's termination for falsification of medical records and documentation relating to their investigation.  *See* (Def.'s Ex. A-4, A-13; Papa Dep., at 293:15–20).  This is sufficient to satisfy their burden.

To show pretext, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  *Burton v. Teleflex Inc.*, 707 F.3d 417, 427 (3d Cir. 2013).  "When a plaintiff challenges the credibility of the employer's proffered justification, [s]he must produce evidence demonstrating such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence."  *Proudfoot v. Arnold Logistics, LLC*, 629 F. App'x 303, 307 (3d Cir. 2015) (quoting *Burton*, 707 F.3d at 427 (internal quotations omitted)).  The plaintiff "must show not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason."  *Id.* (quoting *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997) (en banc)).

Connearney vehemently denies falsifying a medical record; Defendants counter that whether she did or not does not ultimately matter, as long as they fired her while having a good faith belief that she committed the offense.  (Def.'s Mot. Summ. J., ECF No. 40, hereafter "Def.'s Mot." at 10.)  Several other circuits have approved of this reasoning.  *See, e.g.*, *Sybrandt v. Home Depot, U.S.A., Inc.*, 560 F.3d 553, 559 (6th Cir. 2009) ("[A]s long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be

9

incorrect." (internal quotation omitted)); *Young v. Dillon Co., Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006) ("Thus, the relevant 'falsity' inquiry is whether the employer's stated reasons were held in good faith at the time of the discharge, even if they later proven to be untrue . . . ."); *Waggoner v. Garland*, 987 F.2d 1160, 1166 (5th Cir. 1993) ("Thus, the inquiry is limited to whether the employer believed the allegation in good faith and whether the decision to discharge the employee was based on that belief.").

The Third Circuit does not disagree.  *See Ade v. KidsPeace Corp.*, 401 F. App'x 697, 703 (3d Cir. 2010) (citing approvingly to *Waggoner*, 987 F.2d at 1166)).  It has acknowledged, however, that the accuracy of the underlying investigation is probative of the employer's good faith.  *See Kowalski v. L&F Products*, 82 F.3d 1283, 1290 (3d Cir. 1996) ("The facial accuracy and reliability of the report is probative of whether [the employer] acted in good faith reliance upon the report's conclusions:  the less reliable the report may appear, the greater the likelihood that [employer's] reliance on it to justify his actions was pretextual.").

Even if Defendants relied in good faith on their investigation and its conclusion, however, Connearney can still show pretext by presenting evidence that the investigation was tainted by a party who did in fact act with discriminatory animus.  This is the so called "Cat's Paw" theory.  *See McKenna v. City of Philadelphia*, 649 F.3d 171, 179 (3d Cir. 2011) ("[I]t is sufficient if those exhibiting discriminatory animus influenced or participated in the decision to terminate." (quoting *Ambramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 268 (3d Cir. 2001)); *see also Staub v. Proctor Hosp.*, 562 U.S. 411, 418–19 (2011) ("We . . . hold that if a supervisor performs an act motivated by . . . animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable . . . .").

10

Barenbaum's involvement in Defendants' investigation remains somewhat unclear. Barenbaum spoke with Hogan a few days after the incident. (Barenbaum Dep., at 193:6.)  In her deposition, Barenbaum described this as "a one-minute conversation" where it "was more [Hogan] speaking than [Dr. Barenbaum]." (*Id.* at 193:10–12.)  According to Barenbaum, Hogan did not ask her about the medical records in question.  Barenbaum recalled the incident:  "I mean, we didn't even discuss the charting.  This was never discussed." (*Id.* at 196:15–16.) Instead, Hogan was focused on the fact that Connearney had ordered food for a patient and the "type of food," because Hogan did not think it was appropriate for buffalo wings to be ordered for this patient. (*Id.* at 197:3–6, 193:23–194:2.)  Yet, Defendants purported reason for terminating Connearney is not that she *ordered* buffalo wings for a patient, but that she *falsified* records about the food.

Based on her conversation with Hogan, Barenbaum said she speculated that Hogan had some other issues with Connearney before the November 21 incident. (*Id.* at 201:11–202:1.) Outside of this one minute conversation with Hogan, Barenbaum never spoke about it again with anyone until two weeks before her deposition in this case. (*Id.* at 202:1–15.)  Human resources never questioned Barenbaum; in fact, Barenbaum testified that she "didn't even know it went to that. [She] had no idea." (*Id.* at 202:14–15.)  Hogan and Baron both contradict Barenbaum's testimony.  Hogan recalled her conversation with Barenbaum quite differently.  "So I went out and talked to Barenbaum and I said did you agree that the patient could eat?  And she said no, I would never order buffalo wings, this is—and she went on about her husband eats them and he's 20 pounds overweight, she went on like a tear. And so that was it." (Hogan Dep., at 373:18–24.) Hogan claimed the conversation lasted ten minutes. (*Id.* at 374:3–4.)  In an email to Hogan, Baron claims that Barenbaum came to him to discuss her concerns over the incident. (Def.'s Ex.

A-10.)  Barenbaum, however, had a different take:  "I believe Marc Baron overheard [Connearney] and I speaking about it, but beyond—when I walked out of the emergency department that day, that's the last I spoke of it, so we didn't—there was nothing.  There was no other discussion beyond that."  (Barenbaum Dep., at 192:4–10.)

Defendants contend that Cusick conducted the investigation and made the decision to terminate Connearney.  Cusick's report summarizing her findings, (Def.'s Ex. A-13), relies on statements supposedly made by Barenbaum.  Since, according to Barenbaum, Cusick never spoke to her, Cusick may be relying on Hogan's conversation with Barenbaum (the contents of which are disputed) and Baron's conversation with Barenbaum (the existence of which is disputed).[6]  Thus a reasonable factfinder could conclude that Defendants' investigation was flawed with inconsistencies and weaknesses and that Defendants could not have relied on it in good faith.

Barenbaum's testimony also demonstrates that Hogan was involved from the very beginning of the investigation into the November 21 incident.  Given the other evidence in the record to suggest that Hogan could have discriminated against Connearney and others on the basis of age, her early and continued involvement[7] in the investigation raises questions for a jury.  A reasonable factfinder could conclude that Hogan had significant involvement in the investigation which may have tainted its ultimate conclusion.

---

[6]      Papa testified that Cusick spoke to Barenbaum to determine what happened on November 21.  (Papa Dep. 295:17–19).  This contravenes Barenbaum's testimony.

[7]      The investigation into the November 21 incident started when Marc Baron sent an email to Hogan about the alleged falsification of records.  (Def.'s SOF ¶ 13, Def.'s Ex. A-5.)  Later on November 21, Hogan reported the incident to Papa and Cusick.  (Def.'s SOF ¶ 21.)  In this email, Hogan said that Barenbaum approached her about the incident.  (*Id.*)  Papa had also suggested that Hogan and Baron meet with Connearney to discuss the incident.  (Def.'s Ex. A-8.)  Thereafter, Hogan asked Baron for a detailed timeline of events, which Baron sent to Hogan on November 29.  (Def.'s SOF ¶ 30, Def.'s Ex. A-10.)  Hogan also testified that she and Cusick reviewed the medical records.  (Def.'s SOF ¶ 37, Hogan Dep. 380:22–24.)  Two to three weeks after the incident, Hogan had a conference call with Cusick and Dr. Berry to discuss this incident.  (Hogan Dep. 375:13–21.)  At some point, Papa instructed Hogan to remove Connearney from the schedule pending the investigation.  (Hogan Dep. 380:24–381:3.)

**ii.**

Connearney also asserts an ADEA hostile work environment claim. The Third Circuit has assumed that such a claim is cognizable. *See Slater v. Susquehanna Cty.*, 465 F. App'x 132, 138 (3d Cir. 2012) (citing *Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999); *Crawford v. Medina Gen. Hosp.*, 96 F.3d 830, 834 (6th Cir.1996)). Thus, a court should analyze an ADEA hostile work environment claim using the same standards applicable to a Title VII hostile work environment claim. *Id.*; *see also Lambert v. Xpress Global Sys., Inc.*, No. 15-1451, 2016 WL 1639668, at *3 (W.D. Pa. Apr. 26, 2016). To establish a *prima facie* case of a hostile work environment, an employee must prove: (1) she suffered intentional discrimination because of her age; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same age; and (5) the existence of respondeat superior liability. *Huston v. Procter & Gamble Paper Products Corp.*, 568 F.3d 100, 104 (3d Cir. 2009).

A court must evaluate this claim under the totality of the circumstances. *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1484 (3d Cir. 1990). Importantly, however, the "discrimination must be 'because of' the employee's protected status or activity." *Id.* (citing *Andreoli v. Gates*, 482 F.3d 641, 643 (3d Cir.2007)). Moreover, "simple teasing, offhand comments, and non-serious isolated incidents . . . [do] not amount to discriminatory changes in the terms and conditions of employment." *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 280 (3d Cir. 2001) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) (quotations omitted)); *see also Greer v. Mondelez Global, Inc.*, 590 F. App'x 170, 173 (3d Cir. 2014) (citing *Faragher*, 524 U.S. at 786) ("Mere offensive utterances are insufficient to create a hostile

environment, even if they engender offensive feelings in an employee.")  The ADEA, like Title

VII, is not "a general civility code."  *Faragher*, 524 U.S. at 788.

To evaluate the first element, the proper question is "whether a reasonable factfinder

could view the evidence as showing [Connearney's] treatment was attributable to her [age]."

*Abramson*, 260 F.3d at 277.  This does not require a showing of direct evidence of intentional

discrimination because the "intent to discriminate can be inferred." *Id.* at 278.  Connearney

testified that not long after Hogan became her supervisor, Hogan asked Connearney how long

many of her coworkers had worked at Lankenau.  (Connearney Dep. II, 5:2–7:10, 9:16–19.)

According to Connearney, Hogan said, in front of several of her colleagues, that she "could

replace the older, jaded nurses. . . ."  (*Id.* at 14:9–17, 20:10–22.)  "Kathie Hogan personally

asked me why she couldn't get rid of the older people . . . ."  (Connearney, Dep. I, at 336:7–8.)

Connearney further testified that Hogan told her to write up certain staff members, (*Id.* at 28:7–

8.), and Hogan told her to make up things when documenting employee discipline.  (*Id.* at 66:13–

14.)  In her declaration[8] Connearney recounts that "[a]t one point in or around January 2014,

Hogan asked me, 'why won't these older employees leave?  Why can't I roll them out the door?"

(Connearney Dec. ¶ 23.)

Connearney says Hogan did not target her until she became a full time employee.

(Connearney Dep. II, at 16:6.)  Two weeks after her January 2013 promotion, Connearney said

Hogan told her that she should have fired her.  (*Id.* at 17:6–7, 6:22, 18:18–19:1.)  After becoming

full time, Connearney was entitled to vacation benefits; she testified, however, that Hogan had,

on multiple occasions, taken away her vacations.  (*Id.* at 19:8–9, 20:5.)  At some point and for

---

[8]        Defendants filed a motion to strike Connearney's declaration, or in the alternative, to strike from it certain
paragraphs.  *See* (ECF No. 55.)  The Court held oral argument on the motion on October 14, 2016.  At oral
argument, Defendants explained that their concerns were limited to certain specific paragraphs (and in some cases,
just portions of some of these paragraphs).  None of the material to which the Defendants objected was relevant to
any decisions made or reasoning relied upon in this Memorandum.

ten weeks straight, Hogan conducted meetings with Connearney where she would yell and scream at her while banging her fists on the desk and tossing papers around. (Connearney Dec. ¶ 20.) Considering the totality of the circumstances, a reasonable jury could conclude that Hogan targeted Connearney because of her age.

"To determine whether the comments were severe or pervasive, [the Court] evaluate[s] 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating or a mere offensive utterance; and whether it unreasonably interferes with the employee's work performance.'" *Whitesell v. Dobson Comm'n*, 353 F. App'x 715, 717 (3d Cir. 2009) (quoting *Faragher*, 524 U.S. at 787). Connearney's coworkers provide evidence that Hogan's conduct was far from rare or isolated. Rebecca Baranowski confirmed that Hogan kept a file of those employees she wanted to terminate. (Baranowski Dep., at 47:14–25, 49:10–18.) Baranowski testified that Hogan was more punitive and strict with "long-term employees that were older." (*Id.* at 38:7–11.) According to Baranowski, Hogan said "it was a shame that she had to pay older employees so much money when they were jaded." (*Id.* at 38:15–17.) Baranowski also testified that Hogan said that a coworker was "getting too old for this job and he just needed to move on." (*Id.* at 52:19–20.) And of another older nurse, Hogan remarked, "[s]he should move on. She should just roll out the door and move on because, you know, they're squeaky wheels." (*Id.* at 53:2–6.)

In an affidavit, Elizabeth Berg said she heard Hogan "make comments to nurses that she could find somebody 'cheaper and young' to do their job." (Berg Affidavit ¶ 14.)[9] Debra Ruetz

---

[9]     At the time, Berg did not realize that the vast majority of nurses Hogan criticized were over 40 years old. (Berg. Affidavit, ¶ 15.) Younger nurses "received preferential treatment and no discipline for issues they should have been disciplined for." (*Id.* ¶ 16.) "When I left, it seemed that many of the senior, experienced nurses were fired by Ms. Hogan or left on their own because of her. Turnover under Ms. Hogan was significant and was significantly higher than under our previous manager." (*Id.* ¶ 28.) "Ms. Hogan's decimation of the senior staff affected our ability to continue providing excellent patient care." (*Id.* ¶ 29.) "At the time, it did not occur to me that that [sic] it was mostly the people who were there the longest that were leaving." (*Id.* ¶ 32.)

stated, "Ms. Hogan told us she would replace older, jaded, worn out nurses with agency nurses."
(Ruetz Affidavit ¶ 3.)  "I felt I was a target for termination [because I was 53 years old]."  (*Id.*)
"I always felt that it was the Lankenau plan to find ways to fire or terminate the older and higher
paid nursing staff in the ER."  (*Id.* ¶ 37.)

 Roberto Lombardi said that "my observation was that Hogan appeared to be targeting the
senior, experienced employees to try and rid the [Emergency Department] of the higher salaried
staff.  To my knowledge, the senior, experienced staff that was targeted were mostly over the age
of 40."  (Lombardi Affidavit, ¶ 4.).  "The employees discussed with others the fact that she was
looking for reasons to terminate the senior, experienced staff.  The senior staff felt on edge and
feared that they might be the next person targeted."  (*Id.* ¶ 5.)

 Paulette Edwards said "Lankenau Hospital, acting through Kathleen Hogan, began
operating under a policy to terminate older nurses with long tenures."  (Edwards Affidavit ¶ 16.)
"Hogan told us . . . she was there to 'clean house,' meaning that she was there to terminate or
otherwise force out these nurses and technicians who were 'over paid' or owed higher salaries,
pensions and other employee benefits as a result of long tenures."  (*Id.* ¶ 4.)  Hogan would
fabricate charges to create a record to justify the termination of employees.  (*Id.* ¶ 5.)  On top of
this, Connearney and her coworkers said Hogan gave special treatment to the younger nurses on
staff.  (Connearney Dec. ¶ 22, Baranowski Dep., at 43:9–10, Berg. Affidavit ¶ 16.)  A reasonable
jury could conclude that this discrimination was severe and pervasive.

 The record evidence establishes the final three elements of the *prima facie* case as well.
Connearney testified that Hogan's actions detrimentally affected her.  She suffered anxiety, heart
palpitations and jaw clenching.  (Connearney Dec. ¶ 33.)  Connearney was not alone.  Her
coworker, Carrie Alesio, said Hogan made her feel physically ill.  (Alesio Dep. 80:15–17.)

Baranowski testified that she remains anxious to this day when dealing with her supervisors because of Hogan's actions.  (Baranowski Dep., at 115:10–15.)  Jack Falkenstein, another coworker, testified that Hogan caused him emotional distress.  (Falkenstein Dep., at 22:8–10.)  This evidence is sufficient for a reasonable jury to conclude that Hogan's discrimination detrimentally affected a reasonable person of the same age.

Finally, if supervisors create the hostile environment, the employer is strictly liable, though an affirmative defense may be available where there is no tangible employment action.  *Peace-Wickham v. Walls*, 409 F. App'x 512, 519 (3d Cir. 2010) (quoting *Jensen v. Potter*, 435 F.3d 444, 448 (3d Cir. 2006)).  Here, the evidence shows that Hogan was at the center of the alleged hostile work environment.  Hogan was a supervisor and there was a tangible employment action, namely, Connearney's termination.

## B.

Count II is a failure to accommodate claim under the ADA.  *See* 42 U.S.C. § 12111 *et. seq*; *see also* (Tr. of Oral Arg., at 144:17–18).  To establish a *prima facie* case of discrimination under the ADA, Connearney must show: (1) she is a disabled person within the meaning of the ADA; (2) she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) she has suffered an otherwise adverse employment decision as a result of discrimination.  *See Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999).  "Discrimination under the ADA . . . includes failing to make reasonable accommodations for a plaintiff's disabilities."  *Taylor*, 184 F.3d at 306.  "Therefore, an employer discriminates when it does not make reasonable accommodations to the known physical or mental limitations of the individual unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the

employer." *Twillie v. Erie School Dist.*, 575 F. App'x 28, 32 (3d Cir. 2014) (quoting *Taylor*, 184 F.3d at 306) (internal quotations omitted).

"[W]hen accommodations are at issue in an ADA claim, the burden is on the employee or a representative to inform the employer of both the disability and desire for an accommodation." *Drozdowski v. Northland Lincoln Mercury*, 321 F. App'x 181, 185 (3d Cir. 2009). "While the notice does not have to be in writing, be made by the employee, or formally invoke the magic words 'reasonable accommodation,' the notice nonetheless must make clear that the employee wants assistance for his or her disability." *Taylor*, 184 F.3d at 313; *see also Colwell v. Rite Aid Corp.*, 602 F.3d 495, 506 (3d Cir. 2010). Thus, an employer must know of "both the disability and the employee's desire for accommodations *for that disability*." *Id.* (emphasis added); *see also Conneen v. MBNA Am. Bank, N.A.*, 334 F.3d 318, 332 (3d Cir. 2003). "What matters under the ADA are not formalisms about the manner of the request, but whether the employee or a representative for the employee provides the employer with enough information that, under the circumstances, the employer *can be fairly said to know* of both the disability and desire for an accommodation." *Id.* (emphasis added).

Defendants do not dispute that Connearney is disabled[10] or that she was otherwise qualified for the position. Instead, they primarily argue that there is no record evidence that Defendants knew about Connearney's disability. (Def.'s Mot., at 7.)[11] Connearney contends that she provided notice to Defendants through an August 16, 2014 letter to Papa. (Pl.'s Ex. DD.)

---

[10]    The Act defines a disability as either: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual ["actual disability"]; (B) a record of such an impairment; or (C) being regarded as having such an impairment." *Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751, 762 (3d Cir. 2004) (citing 42 U.S.C. § 12102(2)). Connearney contends that her experiencing clenched teeth, hypertension, chest pain, and anxiety made her disabled for the purposes of the ADA. (Tr. of Oral Arg., at 145:11–13.)

[11]    Defendants also argue there is no evidence that an adverse action was taken against her on the basis of her disability and that even if they had knowledge of her disability, they provided reasonable accommodation. (ECF No. 40, at 7.)

This letter largely discusses Connearney's concerns regarding Hogan.  She first criticizes

Hogan's leadership skills.  Next, she tells Papa that she is "anything but satisfied working under

Kathie Hogan," she feels "harassed, bullied and intimidated, working in a hostile work

environment," and she asks Papa to "remedy this."  (*Id.*)  Connearney then mentions that

"Hogan's harassing tactics" have caused her stress, including "clenching [her teeth,] HTN, chest

pain and anxiety." (*Id.*)  She concludes the letter by requesting a transfer to another hospital if

there is an available position.

Connearney also says she requested accommodation for her disability during a September

4, 2014 meeting with Papa, Cusick and Iacobacci. Connearney recounts this meeting in detail in

her declaration.  (Connearney Dec. ¶ 39–42.)  According to Connearney's account, the discussion

at the meeting largely centered on Connearney's concerns with Hogan.  She expressed fear of

harassment from Hogan and requested a transfer to another hospital.  (*Id.*)  She says that she told

them she "tried to seek counseling through the Employee Health program . . . but was

unsuccessful since [she] was told not to come to [her appointment]."  (*Id.*)  She told them she

"was strong and capable of doing [her] job, but they needed to take [her] complaints seriously

and investigate."  (*Id.*)

The record evidence upon which Connearney relies falls far short of demonstrating "a

great deal of communication" about her disability.  *Taylor*, 184 F.3d at 312.  To the contrary, it

focuses instead on her problems with Hogan.  Likewise, this evidence fails to show that

Defendants could "be fairly said to know" of her disability.  *Id.*  The letter and account of the

meeting link her request for accommodation to her problems with her supervisor, not to her

alleged disability.  *Cf. McLean v. Abington Mem'l Hosp.*, No. 15-671, 2015 WL 5439061, at *9

(E.D. Pa. Sept. 15, 2015) ("Without some evidence tying the transfer request to [plaintiff's]

disability, the request relates to her displeasure with her supervisor rather than an

accommodation request triggering the Hospital's obligation to engage in the interactive

process."). The record evidence does not create a genuine issue of material fact with respect to

the Defendants' knowledge of her disability and Connearney cannot establish a *prima facie* case

of failure to accommodate under the ADA.

## C.

Count III alleges retaliation in violation of the ADA, ADEA and the PHRA against

Lankenau.  To establish a *prima facie* case of retaliation, Connearney must demonstrate that:  (1)

she engaged in a protected activity, (2) she suffered an adverse employment action and (3) there

was a causal connection between the protected activity and the adverse employment action.  *See*

*Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997) (ADA); *Fasold v. Justice*, 409 F.3d

178, 189 (3d Cir. 2005) (ADEA and PHRA).[12]

### i.

Connearney claims that Defendants retaliated against her in violation of the ADA because

she exercised her right to complain about harassment and discrimination.  (Am. Compl. ¶ 131.)

The ADA makes it unlawful to "discriminate against any individual because such individual has

opposed any act or practice made unlawful [under the ADA]."  42 U.S.C. § 12203(a).  To engage

in the protected activity necessary to establish her *prima facie* case, Connearney must have an

"objectively reasonable belief that the activity [she] opposes constitutes unlawful

discrimination."  *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 322 (3d Cir.

2008).  "[I]f no reasonable person could have believed that the underlying incident complained

about constituted unlawful discrimination, then the complaint is not protected."  *Id.*

---

[12]      "Because the anti-retaliation provisions of the ADA and ADEA are nearly identical, as is the anti-retaliation
provision of Title VII, [The Third Circuit has] held that precedent interpreting any one of these statutes is equally
relevant to interpretation of the others."  *Fogleman v. Mercy Hops., Inc.*, 283 F.3d 561, 567 (3d Cir. 2002).

Connearney did not put Defendants on notice of her disability.  *See supra* Part III.B.  She

does not point to any additional evidence in the record to show that her complaints about

bullying and harassment were protected activity under the ADA.  Connearney's response to

Defendant's summary judgment motion does not even discuss retaliation under the ADA.  It

argues instead there is evidence in the record to support her ADEA retaliation claim.  Because

there is no evidence showing that Defendants knew of her disability, a reasonable juror could not

find that her complaints to Defendants were protected activity under the ADA.

### ii.

Connearney also claims that Defendants retaliated against her in violation of the ADEA

and PHRA[13] because she exercised her right to oppose unlawful discrimination.  (Am. Compl.

¶ 131.)  The ADEA makes it "unlawful for an employer to discriminate against any of his

employees . . . because such individual . . . has opposed any practice made unlawful by [the

ADEA].  29 U.S.C. § 623(d).  Connearney must show that she engaged in protected conduct by

opposing discrimination *on the basis of age*.  *See Barber v. CSX Dist. Serv.*, 68 F.3d 694, 702 (3d

Cir. 1995).  "[I]f no reasonable person could have believed that the underlying incident

complained about constituted unlawful discrimination, then the complaint is not protected."

*Wilkerson*, 522 F.3d 315, 322 (3d Cir. 2008).

Connearney points to three specific documents to demonstrate that she engaged in a

protected activity related to her age:  (1) a July 25, 2014 email from Connearney to Clifford; (2)

a July 27, 2014 email from Connearney to Papa; and (3) the August 16, 2014 letter from

---

[13]     "The language of the PHRA is . . . substantially similar to [the ADEA], [thus the Third Circuit has] held
that the PHRA is to be interpreted as identical to federal anti-discrimination laws except where there is something
specifically different in its language requiring that it be treated differently."  *Fogleman*, 283 F.3d at 567.  No party
has argued that the PHRA should be treated differently from federal law for the purposes of this retaliation claim.
Accordingly, the Court will not separately analyze the PHRA here.

Connearney to Papa (*see supra* Part III.B). *See* (Pl.'s Resp. to Def.'s Mot. for Summ. J., ECF No.49-2., hereafter "Pl.'s Resp.," at 19–20; Tr. of Oral Arg., at 123:19–128:25).

In the July 25 email to Clifford, Connearney writes in part to explain her role and defend her actions related to a previous disciplinary incident unrelated to the events of November 21. (Pl.'s Ex. EE.)   In the second half of the email, Connearney voices her concerns about Hogan. "I feel she is a bully and not sure what she wants from me, every senior employee—I have been here the longest I have never seen such a turn over [sic] of retained[14] employees." (*Id.*)

In the July 27 email to Papa, Connearney continues to complain about Hogan and her lost vacations. (*Id.*)  She mentions that she has been an ER nurse for 25 years.  She also says that she does not "deserve to be harassed or be in a hostile environment" and that she has the most experience on the night shift. (*Id.*)

In the August 16 letter to Papa, Connearney again takes issue with Hogan.  "I feel anything but satisfied working under Kathie Hogan; what I do feel is harassed, bullied and intimidated, working in a hostile work environment, and I am asking you to remedy this." (Pl.'s Ex. DD.)  She also discusses how her coworkers feel the same way.  "Most are intimidated and frightened as I am, but I am sure this is not the last time you will hear someone come forward.  I have 25 years [sic] experience *imagine how the young new nurses feel*." (*Id.* (emphasis added).)

This record evidence is not sufficient to raise a genuine issue of material fact as to whether Connearney engaged in a protected activity under the ADEA.  These communications make clear that Connearney felt Hogan was a horrible boss who was harassing and bullying her and her coworkers.  What they do not make clear to a reasonable person is that Hogan was harassing Connearney *because of her age*.  There is no complaint about age discrimination in any

---

[14]       At oral argument, Connearney's counsel admitted that "retained employees" can be under 40 and that retention is really "a question of experience."  (Tr. of Oral Arg., at 125:18–24.)

of these communications.  *Cf. Barber*, 68 F.3d at 702 ("[Plaintiff's] letter is just too vague to support a finding that his job was eliminated because he engaged in behavior that was protected under the ADEA. . . . A general complaint of unfair treatment does not translate into a charge of illegal *age* discrimination.); *see also id.* at 701 ("[Plaintiff's] letter . . . complains about unfair treatment in general . . . but it does not specifically complain about age discrimination.").

Connearney believes that her references to her experience, to "senior" employees, and her mention of a "hostile work environment" is sufficient to show she was engaged in protected activity.  She is incorrect.  As an initial matter, merely mentioning her experience falls far short of saying she is being discriminated based on her age.  *Cf. Hazen Paper Co. v. Biggins*, 507 U.S. 604, 611 (1993) ("Because age and years of service are analytically distinct, an employer can take account of one while ignoring the other, and thus it is incorrect to say that a decision based on years of service is necessarily 'aged based.'").  Regardless, these quoted portions of emails and letters—when viewed in their context—do not hint at age discrimination.  Connearney's letter could even be read to suggest the opposite.  Indeed, her concern over "how the young new nurses feel," (Pl.'s Ex. DD), tends to show that Hogan was an equal opportunity offender, picking on subordinates no matter their age.

## D.

Count IV is an FMLA retaliation claim against Lankenau.  The FMLA prohibits employers from retaliating against employees who take protected leave.  *See Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 146 n.9 (3d Cir. 2004).  To establish a *prima facie* case of FMLA retaliation, Connearney must show that:  (1) she invoked her FMLA right to leave; (2) she suffered an adverse employment action; and (3) the adverse action was causally connected to her invoking her right to FMLA leave. *See Lichtenstein v. Univ. of Pitt. Med. Ctr.*, 691 F.3d 294,

301–02 (3d Cir. 2012).  Here, Connearney took FMLA leave and was subsequently terminated.
The question is therefore whether she can establish causation.  To do so, Connearney "must point
to evidence sufficient to create an inference that a causative link exists between her FMLA leave
and her termination."  *Lichtenstein*, 691 F.3d at 307.

Connearney allegedly falsified medical records on Friday, November 21, 2014.  (Def.'s
SOF ¶ 12.)  This was the last day she worked at Lankenau, as Papa instructed Hogan to remove
Connearney from the schedule and to direct Connearney to meet with human resources on
December 1, 2014 to discuss the incident.  (Def.'s SOF ¶ 33.)  Hogan called Connearney to tell
her this news on November 26, 2014.  (Connearney Dec. ¶ 63.)  Connearney did not meet with
human resources, but instead took FMLA leave from December 1, 2014 to January 14, 2015.
(Def.'s SOF ¶ 35, Connearney Dep. I, at 135:24–136:5, Pl.'s Ex. EEE.)  Connearney met with
Papa, Cusick and Hogan on January 16, 2015 to discuss, for the first time, the alleged
falsification of medical records.  (Def.'s SOF ¶ 36.)  On January 21, 2015 Defendants terminated
Connearney.  (Def.'s SOF ¶ 6.)

Connearney relies on temporal proximity to establish causation.  "When the 'temporal
proximity' between the protected activity and adverse action is 'unduly suggestive,' this 'is
sufficient standing alone to create an inference of causality and defeat summary judgment.'"  *Id.*
(quoting *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007)).  There
is "no bright line rule as to what constitutes unduly suggestive temporal proximity."[15]  Indeed,

---

[15]     *LeBoon*, 503 F.3d at 233 (finding a gap of three months not unduly suggestive in Title VII retaliation case);
*see also Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 331 (3d Cir. 2015) (same); *Williams v. Phila. Housing Auth.
Police Dept.*, 380 F.3d 751, 761 (3d Cir. 2004) (finding over two month gap not unduly suggestive in ADA
retaliation case).  *But see Lichtenstein*, 691 F.3d at 307 (finding termination seven days after plaintiff invoked right
to FMLA leave was unduly suggestive); *Jalil v. Avdel Corp*, 873 F.2d 701, 708 (3d Cir. 1989) (finding two days
unduly suggestive in Title VII retaliation case); *see also Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)
("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an
adverse employment action as sufficient evidence of causality to establish a *prima facie* case uniformly hold that the
temporal proximity must be 'very close.'" (citations omitted)).

the Third Circuit has been "reluctant to infer a causal connection based on temporal proximity alone," *Leboon*, 504 F.3d 232, and has instructed courts to determine whether a causal link exists with a "careful eye to the specific facts and circumstances encountered." *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 258 (3d Cir. 2014) (quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 n.5 (3d Cir. 2000)).  "Where the temporal proximity is not unusually suggestive, [the Court] ask[s] whether the proffered evidence, looked at as a whole, may suffice to raise the inference.'" *LeBoon*, 503 F.3d at 232 (internal quotation omitted).

Connearney was fired over seven weeks after she began her FMLA leave but only one week after the end of her leave.  She contends the seven day period between her returning from leave and her termination is unduly suggestive of causation.  The Third Circuit has indicated that the temporal proximity between the protected activity and the adverse employment action can be measured not necessarily from when the employee first takes her leave, but instead can run from after the leave ends.  *See Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 258 (3d Cir. 2014).  When considering the specific facts and circumstances of this case, however, Connearney's termination *after* she took FMLA leave for events occurring *before* she took leave is not unduly suggestive of causation.  Connearney identifies no evidence in the record, *e.g.*, emails, documents or testimony, which suggest in any way that her termination was connected to her FMLA leave.

Assuming, *arguendo*, that the Defendants conducted an incomplete and biased investigation into the November 21 incident, this would not explain how Connearney's subsequent FMLA leave had anything to do with her termination.  The Defendants began the investigation *before* Connearney took FMLA leave.  While the record includes evidence suggesting that Defendants used the November 21 incident as a pretext to fire Connearney for

age discrimination, *see supra* Part III.A, it is implausible to believe, and there is no evidence in the record to indicate otherwise, they did so because of her taking FMLA leave.  Connearney took this leave *after* the November 21 incident, *after* she was removed from the schedule and *after* the supposedly pretextual investigation was already underway.

**E.**

Count VI asserts that that Hogan, Robinson, Papa, Clifford and Iacobacci aided and abetted age discrimination under the PHRA by failing to prevent further acts of discrimination. (Tr. of Oral Arg., at 96:20–23.)  Section 955(e) of the PHRA makes it unlawful for "any person, employer . . . or employee, to aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice. . . or to attempt, directly or indirectly, to commit any act declared by this section to be an unlawful discriminatory practice."  43 Pa. Cons. Stat. § 955(e).  "Based on the theory that only supervisory employees can share the discriminatory purpose and intent of the employer, such supervisors can be held personally liable under an aiding and abetting theory for their own direct acts of discrimination or their failure to take action to prevent further discrimination."  *Brown v. TD Bank, N.A.*, at *10 (E.D. Pa. Apr. 4, 2016); *see also Davis v. Levy, Angstreich, Finney, Baldante, Rubenstein & Coren P.C.*, 20 F. Supp. 2d 885, 887 (E.D. Pa. 1998); *Dici v. Com. of Pa.*, 91 F.3d 542, 552–53 (3d Cir. 1996).

The record establishes a genuine issue of material fact as to whether Hogan discriminated against Connearney her based on her age.  *See supra* Part III.A.  Hogan was Connearney's direct supervisor for several years. A reasonable jury could conclude that Hogan is individually liable under the PHRA for her conduct.  No reasonable juror could conclude on this record, however, that Papa, Clifford, Iacobacci or Robinson aided and abetted age discrimination.

As an initial matter, Connearney provides no citation to the record to support these claims. *See Perkins v. City of Elizabeth*, 412 F. App'x 554, 555 (3d Cir. 2011) ("Courts cannot become advocates for a party by doing for that party what the party ought to have done for him or herself.")  Connearney's theory is that these Defendants were aware of Hogan's age discrimination and did nothing to stop it.  Therefore, she must point to evidence on which a reasonable jury could conclude that the Defendants had knowledge of Hogan's alleged *age* discrimination.  Just as her ADEA retaliation claim failed because she could not produce evidence that she voiced opposition to Hogan's age discrimination, so too do her aiding and abetting claims fail here.

Connearney does not cite to any evidence in the record that shows Papa knew of Hogan's alleged age discrimination.  At oral argument when discussing these claims, Connearney's counsel directed the court to the "emails in July and the letter in August" sent to Papa.  (Tr. of Oral Arg., at 139:24–25.)  This is apparently a reference to the email and letter sent from Connearney to Papa on July 27, 2014 and August 16, 2014 respectively.  For the reasons discussed in the context of the ADEA retaliation claim, *see supra* Part III.C.ii, these communications do not put Papa on notice that Connearney was complaining about age discrimination.  Similarly, the only relevant communication from Connearney to Clifford in the record, a July 25, 2014 email, (Pl.'s Ex. EE.), does not put Clifford on notice of a claim of age discrimination.  *See supra* Part III.C.ii.

The Court is not sure where it is supposed to look for evidence that Iacobacci aided and abetted age discrimination.  Iacobacci was not deposed, nor has she submitted an affidavit.  At oral argument, Connearney's counsel asserted that Iacobacci was "involved in a lot of meetings

with Mr. Papa, Ms. Cusick, and the Plaintiff . . . [s]o she's more aware of what's going on."[16] (Tr. of Oral Arg., at 141:24–142:3.)  This is not sufficient.  The Court cannot find any record evidence that Iacobacci knew Connearney was complaining about age discrimination.

There is no evidence that Robinson aided and abetted age discrimination.  At oral argument, Connearney's counsel cited a November 9, 2014 email from Connearney to Robinson in purported support of the allegations against Robinson.  (Pl.'s Ex. OO.)  This email exchange is not fully understandable.[17]  Regardless, Connearney's counsel conceded at oral argument that nowhere in the email exchange with Robinson was age discrimination mentioned.  (Tr. of Oral Arg., at 140:19–141:2.)[18]

## IV.

Count VII alleges Main Line Hospitals and Lankenau violated the Pennsylvania Medical Care Availability and Reduction of Error Act ("MCARE Act"), and in doing so, violated the Pennsylvania Whistleblower Law.  MCARE requires, in relevant part, a health care worker to report wrongdoing "immediately . . . but in no event later than 24 hours after the occurrence or discovery of a serious event or incident."  40 Pa. Cons. Stat. § 1303.308(a).  A "serious event" is "[a]n event, occurrence or situation involving the clinical care of a patient in a medical facility that results in death or compromises patient safety and results in an unanticipated injury

---

[16]      Connearney's counsel also stated that at the January 16, 2015 meeting, Connearney told Iacobacci that Hogan was "getting rid of all the older people."  (Tr. of Oral Arg., at 1281:2–7; 142:18–20.)  Counsel did not provide a citation to the record to support this assertion and the Court finds no such support.

[17]      It appears from the referenced exhibit that Connearney forwarded a letter written by Rebecca Baranowski to Robinson.  This letter is also a separate document filed by Connearney as exhibit KK.  Baranowski does not mention anything resembling concerns about age discrimination in this letter.  (Pl.'s Ex. KK.)  Instead, her letter explains that she resigned because of Hogan's bullying.  (*Id.*)  The email from Connearney to Robinson also references other letters that Connearney sent to human resources and it asks Robinson to read them.  It is not clear from Plaintiff's exhibits if these letters are also a part of the record.

[18]      Because Papa, Iacobacci and Robinson did not have sufficient notice of alleged age discrimination, the Court need not decide if they are Connearney's supervisors for the purpose of the PHRA.

requiring the delivery of additional health care services to the patient." *Id.* § 1303.302. An "incident" is "[a]n event, occurrence or situation involving the clinical care of a patient in a medical facility which could have injured the patient but did not either cause an unanticipated injury or require the delivery of additional health care services to the patient." *Id.* § 1303.302.

The Whistleblower law protects a health care worker "who reports the occurrence of a serious event or incident" under the MCARE Act. *See* 40 Pa. Cons. Stat. § 1303.308(c). To establish a *prima facie* case of a violation of the Whistleblower law, an employee must show that she made a good faith report of an instance of wrongdoing or waste prior to the alleged reprisal by the employer. *See id.* § 1424(b); *O'Rourke v. Commonwealth*, 778 A.2d 1194, 1200 (Pa. 2001). "Wrongdoing" is "[a] violation which is not of a merely technical or minimal nature of a Federal or State statute or regulation, of a political subdivision ordinance or regulation or of a code of conduct or ethics designed to protect the interest of the public or the employer." 43 Pa. Cons. Stat. § 1422. "Waste" is "[a]n employer's conduct or omissions which result in substantial abuse, misuse, destruction or loss of funds or resources belonging to or derived from Commonwealth or political subdivision sources." 43 Pa. Cons. Stat. § 1422.

Importantly, "a plaintiff must show by concrete facts or surrounding circumstances that the report of wrongdoing or waste led to the plaintiff's dismissal, such as that there was specific direction or information received not to file the report or that there would be adverse consequences because the report was filed." *Golaschevsky v. Com., Dept. of Envtl. Prot.*, 720 A.2d 757, 759 (Pa. 1998). "[V]ague and inconclusive circumstantial evidence" is not sufficient. *Id.*

If a plaintiff establishes a *prima facie* case of a Whistleblower law violation, the burden shifts to defendants to prove "by a preponderance of the evidence that the action by the employer

occurred for separate and legitimate reasons, which are not merely pretextual." *O'Rourke*, 778

A.2d at 1200 (quoting 43 Pa. Cons. Stat. § 1423(c)).  This means that "the employer must prove

that it would have taken the same adverse employment action absent the employee's good-faith

report of wrongdoing."  *Id.* at 1205.

Connearney's whistleblower claim has seemingly evolved over the course of the

litigation.  Nevertheless, at oral argument Connearney's counsel clarified her theory of liability.

(Tr. of Or. Arg., at 157: 3–25.)  She argues that: (1) she reported understaffing in the ER caused

by Hogan's bullying and harassment; (2) this was a report of a "serious event or incident" under

the MCARE Act; and therefore, (3) she is protected under the Whistleblower law.  (Tr. of Or.

Arg., at 157: 3–25.)  The Court is unaware of any cases, and Connearney cites to none,

interpreting the interaction of the MCARE Act's provision and the Whistleblower law or its

scope of protection.

In any event, the MCARE Act does not protect Connearney's reporting, and therefore

neither does the Whistleblower law.  Connearney's report of understaffing is not a serious event

or incident.  Read in context with MCARE's definitions of "incident" and "serious event,"

MCARE's whistleblower protection contemplates a specific and discrete incident of reportable

wrongdoing, not generalized allegations.  Connearney makes no such discrete allegations.

Instead, she claims that Hogan's alleged wrongdoing (over the course of years) created a "short-

staffed workforce with inexperienced nurses."  (Pl.'s Resp., at 22.)

**V.**

In Count X of Connearney's amended complaint she contends that Hogan assaulted her.

To establish an assault claim, Connearney must show that Hogan acted with the intent to put her

in "reasonable and immediate apprehension" of a harmful or offensive touching and this act

actually succeeded in causing such apprehension. *Cucinotti v. Ortmann*, 159 A.2d 216, 217 (Pa. 1960). A bodily contact is offensive if "it offends a reasonable sense of personal dignity." Restatement (Second) of Torts § 19; *see also Schall v. Vazquez*, 322 F. Supp. 2d 594, 602 (E.D. Pa. 2004). "Words in themselves, no matter how threatening, do not constitute an assault; the actor must be in a position to carry out the threat immediately, and he must take some affirmative action to do so." *Regan v. Upper Darby Twp.*, 363 F. App'x 917, 921 (3d Cir. 2010) (quoting *Cucinotti v. Ortmann*, 159 A.2d 216, 217 (Pa. 1960)).

Connearney has described Hogan's alleged assaults in varying ways. In her original complaint, Connearney alleged that, "on more than one occasion," Hogan would get in her face, while shouting, screaming, and threatening Connearney. (Compl. ¶ 152.) The Court dismissed this claim because "[s]imply yelling in someone's face cannot constitute assault." *Connearney v. Main Line Hospitals, Inc.*, 15-2730, 2015 WL 9302912, *7 (E.D. Pa. Dec. 22, 2015). In her Amended Complaint, Connearney pled the same facts but also alleged that Hogan did this in her small office, would scream in close proximity to her face and would bang her fists on the desk. (Am. Compl. ¶ 183.)

When deposed, Connearney added more detail. "For ten weeks she would start banging, and throwing her hands up in the air, and *throwing documents at me*. And it was a very close space . . . ." (Connearney Dep. II, 140:9–10. (emphasis added).) Connearney also testified that Hogan would throw papers up in the air. (*Id.* at 142:10–15.) Hogan never physically touched Connearney, however, and she acknowledged that Hogan never threatened to hit or touch her in an improper way. (*Id.* at 142:16–21.)

While Hogan was deposed in this matter, neither Connearney nor Defendants have cited any testimony she may have given related to the assault claim. The only evidence before the

Court are Connearney's somewhat inconsistent descriptions of her encounters with Hogan.

Resolution of this claim seems more suited for the jurors.  They can assess the witnesses'

credibility and decide whether, based on the testimony, Hogan actually threw any documents "at"

Connearney and whether under the specific circumstances of the encounters Hogan's alleged

conduct rose to the level of an assault under Pennsylvania law.

   An appropriate order follows.

           BY THE COURT:


           ***/s/ Gerald J. Pappert***
           GERALD J. PAPPERT, J.