IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHRISTINA K. CONNEARNEY, | |
| *Plaintiff*, | |
| v. | CIVIL ACTION No. 15-02730 |
| MAIN LINE HOSPITALS, INC. *et al.*, | |
| *Defendants*. | |

**PAPPERT, J.**                                                    **November 4, 2016**

<u>MEMORANDUM</u>

Christina Connearney sued her former supervisor and employer alleging, *inter alia*, claims of disparate treatment and hostile work environment in violation of the Age Discrimination in Employment Act ("ADEA").[1]  Before the Court are Defendants' motions, pursuant to Federal Rule of Evidence 702, to exclude the testimony of Christopher Wright, *see* (ECF No. 41), and Nancy Bonalumi, *see* (ECF No. 42).  Connearney offers Wright as a human resources expert, while Bonalumi's expertise is in nurse management.

Trial begins on Monday, November 7.  The only claims remaining for the jury to evaluate are those under the ADEA as well as aiding and abetting age discrimination under the Pennsylvania Human Rights Act ("PHRA").[2]  To establish a *prima facie* claim of disparate treatment under the ADEA, Connearney must show 1) she is forty years of age or older; (2) Defendants took an adverse employment action against her; (3) she was qualified for the position; and (4) she was replaced by someone sufficiently younger to support an inference of

---

[1]     The Court provided a detailed recitation of the facts in its decision granting in part and denying in part Defendants' Motion for Summary Judgment.  *See Connearney v. Main Line Hosps., Inc.*, No. 15-2730, 2016 WL 6440371, *1–3 (E.D. Pa. Oct. 28, 2016).

[2]     Connearney's common law assault claim against Defendant Kathleen Hogan also survived summary judgment but is not relevant to the proposed expert testimony at issue in these motions.

discriminatory animus.  *See Smith v. City of Allentown*, 589 F.3d 684, 689 (3d Cir. 2009).   To establish a *prima facie* case of a hostile work environment due to age, Connearney must prove: (1) she suffered intentional discrimination because of her age; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same age; and (5) the existence of respondeat superior liability.  *See Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009).  Defendants fired Connearney for falsifying a medical record. The jury must decide if this termination was pretextual.

After reviewing the proposed expert reports, considering Defendants' motions, Connearney's responses, *see* (ECF Nos. 45 & 46), and holding oral argument on November 1, 2016, the Court grants both motions.   As explained in detail below, a large portion of both experts' proposed testimony is not relevant to the remaining claims in this case.  Of the testimony that is conceivably relevant, the testimony does not satisfy Rule 702 because the expert is either not qualified to render such an opinion or the opinion is not reliable.  Finally, the little testimony that could be plausibly considered relevant and reliable would not be helpful to the jury because it offers no specialized knowledge and does no more than infringe upon the jurors' role to make factual determinations and assess the credibility of the witnesses.

## I.

Federal Rule of Evidence 702 governs the admissibility of expert testimony.  The Third Circuit Court of Appeals has explained that the rule "embodies a trilogy of restrictions on expert testimony: qualification, reliability, and fit."  *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003).   In other words, "(1) the proffered witness must be an expert, *i.e.*, must be qualified; (2) the expert must testify about matters requiring scientific, technical or

specialized knowledge; and (3) the expert's testimony must assist the trier of fact."  *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008).  The party offering the expert testimony bears the burden of establishing admissibility by a preponderance of the evidence.  *See Padillas v. Stork-Gamco, Inc.*, 186 F.3d 412, 418 (3d Cir. 1999).

The Third Circuit has interpreted Rule 702's qualification requirement liberally.  *See Pineda*, 520 at 244.  In fact, a "broad range of knowledge, skills, and training can qualify a witness as an expert."  *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994); *see also Clientron Corp. v. Devon IT, Inc.*, No. 13-05634, 2016 WL 1255218, at *1 (E.D. Pa. Mar. 29, 2016).  And "it is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate." *Id.* (quoting *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 782 (3d Cir. 1996)).  The Third Circuit has "not regarded academic training as a prerequisite for qualifying an expert witness" but the witness "must possess [a] skill or knowledge greater than the average layman."  *Betterbox Commc'ns Ltd. v. BB Techs., Inc.*, 300 F.3d 325, 335 (3d Cir. 2002).

"[I]n order for testimony to be reliable, it must be based on appropriate methods and procedures 'rather than on subjective belief or unsupported speculation; the expert must have good grounds for his or her belief.'"  *In re SemCrude L.P.*, 648 F. App'x 205, 213 (3d Cir. 2016) (quoting *Schneider ex rel. Estate of Schneider*, 320 F.3d 396, 404 (3d Cir. 2003)).  The Third Circuit has recognized that "an expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable."  *Pineda*, 520 F.3d at 247 (quoting *Paoli*, 35 F.3d at 742).  "While a litigant has to make more than a *prima facie* showing that his expert's methodology is reliable, [the Third Circuit] ha[s] cautioned that 'the evidentiary

requirement of reliability is lower than the merits standard of correctness.'" *Id.* (quoting *Paoli*, 35 F.3d at 744.)   Thus, the party offering the expert testimony does not have to prove by a preponderance of the evidence that the expert's assessments are correct, but only that the opinion is reliable.  *See Oddi v. Ford Motor Co.*, 234 F.3d 136, 145 (3d Cir. 2000).

The Court should consider several factors when evaluating reliability including, "(1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put."  *Id.* at 247–48.  These factors are "neither exhaustive nor applicable in every case."  *Id.* at 248 (quoting *Kannankeril v. Terminix Intern., Inc.*, 128 F.3d 802, 806–07 (3d Cir. 1997)).

In some cases, however, "the relevant reliability concerns may focus upon personal knowledge or experience."  *Betterbox Commc'n Ltd. v. BB Technologies, Inc.*, 300 F.3d 325, 329 (3d Cir. 2002) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149–50 (1999)).  "If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  Fed. R. Evid. 702 advisory committee's notes to 2000 amendment.

Finally, the testimony must "fit," meaning "the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact."  *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 322 (3d Cir. 2003) (quoting *Schneider v. Fried*, 320 F.3d 396, 405 (3d Cir.

2003)).  "[E]ven if an expert's proposed testimony constitutes scientific knowledge, his or her testimony will be excluded if it is not scientific knowledge for purposes of this case."  *Paoli*, 35 F.3d at 743.  [I]t is plain that the proponent must make more than a *prima facie* showing that a technique is reliable."  *Id.* (quotation omitted).

Although the expert's testimony should assist the trier of fact, "the District Court must ensure that an expert does not testify as to the governing law of the case.  While Federal Rule of Evidence 704 permits an expert witness to give expert testimony that 'embraces an ultimate issue to be decided by the trier of fact,' an expert witness is prohibited from rendering a legal opinion."  *Berckeley Inv. Grp, Ltd. v. Colkitt*, 455 F.3d 195, 218 (3d Cir. 2006) (citation omitted).  Indeed, "[s]uch testimony is prohibited because it would usurp the District Court's pivotal role in explaining the law to the jury."  *Id.* (citing *First Nat'l State Bank v. Reliance Elec. Co.*, 668 F.2d 725, 731 (3d Cir. 1981)).

## II.

An expert witness must satisfy each element of the trilogy of restrictions: qualification, reliability and fit.  *See Schneider*, 320 F.3d at 404.  The Court's greatest concern with Wright's proposed testimony is whether it "fits," so it begins its analysis there.

## A.

Connearney contends that Wright offers nine opinions which satisfy Rule 702.  *See* (Pl.'s Mem. of Law in Opp'n to Def.'s Mot. in Lim, ECF No. 45-2, hereafter "Pl.'s Resp." at 7–8).[3] Among these, Wright concludes that (1) "Hogan's supervisory approach did not comport to best

---

[3]     Connearney apparently does not seek to offer Wright's opinion regarding the following: whether or not Defendants were "attempting to control or lower costs" and how they could achieve such a reduction, (Wright Report, at 3), discussion regarding Defendants' corporate compliance programs, (*id.* at 4), whether Defendants provided an adequate sexual harassment policy in their code of conduct, (*id.* at 6), how Defendants could have improved their performance management system, (*id.* at 7), and whether Defendants had established an effective progressive discipline program, (*id.* at 8).  Obviously, none of these topics are relevant to this case.

management practices, and her management of the Lankenau employees was that of a bully manager," that (2) "Defendants did not follow human resources best practices when conducting incident investigations," that (3) certain incidents were "improperly investigated" and that (4) Defendants' human resources department did not adequately respond to "employee complaints of harassment, bullying, and a hostile work environment."[4]   (*Id.*)   This case is not about whether Defendants followed "best management practices," "human resources best practices" or conducted whatever Wright deems to be a "proper investigation."   The jurors must decide whether Defendants violated the ADEA by targeting Connearney because of her age or by creating a hostile work environment based on age.   Wright's opinions have nothing to do with this alleged age discrimination.   In fact, Wright admits that he does not know the proper legal standard to evaluate discrimination, (Wright Dep., at 201:11–23), and that human resources "best practices" are not required by law, (*id.* at 276:4–13).   Moreover, Wright's opinion about an improper investigation will not aid the jury; the jury can hear testimony, review evidence and conclude whether the investigation was pretextual without the help of an expert.

Testimony on human resources or management "best practices" might also confuse the jury as to the proper legal standard at issue in the case, while adding little that jurors could not already discern for themselves.   *Cf. Crawford v. George & Lynch, Inc.*, No. 10-949, 2013 WL 6504361, *3 (D. Del. Dec. 3, 2013) ("The reasonableness of an employer's response to harassment does not require expert testimony.").

Wright also opines that Defendants' human resources department "knew about Hogan's abusive behavior but inadequately handled and responded to employee complaints of harassment, bullying, and a hostile work environment."   (Pl.'s Resp., at 7.)   The Court has

---

[4]       Three of Wright's opinions related to the Americans with Disabilities Act, Family and Medical Leave Act and retaliation.  Connearney no longer seeks to have Wright offer testimony on these topics because the Court dismissed these claims at summary judgment.

already ruled that Connearney failed to put Defendants on notice of alleged age discrimination so this opinion is not relevant.  *See Connearney*, 2016 WL 6440371, at *11.

Wright's expert report also contains several improper legal conclusions, some of which are no longer even in play in the case.  *See Berckely*, 455 F.3d at 218.  In his supplemental expert report, Wright summarized many of these conclusions: "In my initial report I stated the conclusion that there was a clear and consistent discriminatory bias against the older nurse population in Lankenau Emergency Department, that there had been violations of the Americans with Disabilities Act and the Family Medical Leave Act, and that there had been clear retaliation against Ms. Christina Connearney and others who had complained about Ms. Kathie Hogan." (Wright Supplement, at 2.)

## B.

The remainder of Wright's purported testimony, while conceivably relevant, is not reliable.  Wright concludes that Defendants engaged in age discrimination based on his purported statistical analysis.   *See* (Wright Report, at 13).  Wright has 16 years of human resources leadership experience and 20 years of managerial experience.  (Wright Report, at 1.)  He is certified as a senior human resources professional by the Society for Human Resource Management.  (ECF No. 41-7, Ex. 4.)  He is therefore qualified to offer specialized knowledge about human resources.  Wright is not an expert statistician, however.  He has taken only two statistics classes.  (Wright Dep., at 10:3–4.)  Moreover, Wright failed to demonstrate a fundamental understanding of statistical concepts in his deposition testimony.  (Wright Dep., at 10:15–12:10; 28:6–14.)[5]  He is not qualified to render an expert opinion based on statistical analysis.

---

[5]     Wright was asked what his understanding of a statistically significant sample was and he replied:  "I think it depends on the environment that you're analyzing.  If you look at things like political polls, you and I wouldn't

Wright's initial report contains a chart which summarizes and categorizes the job outcomes of the 63 people who left the Defendants' employ between 2011 and 2015.  Wright has two age categories:  those under 40 years old and those over 40 years old.  In his chart, he lists the percentage of each age category that fell into a particular employment outcome.  For example, Wright claims that 7 percent of employees under the age of 40 were terminated for job performance while 26 percent of employees over the age 40 had the same outcome.  Wright does not explain how he arrived at these percentages.  Instead, the chart is based simply on his "review of the employment data."  (*Id.*)  In other words, it is impossible to check his calculations or characterizations of outcomes.[6]

Moreover, Wright performed no statistical analysis.  He merely compares the raw percentages in each category and concludes that there is a causal connection.  Wright did not conduct a statistical significance test, so the disparity in these numbers could be due to random chance.[7]  *Cf. Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or

---

necessarily say that serving [sic] 1 percent of a population is a statistically significant sample, yet it is the methodology that's used in the political polls.  In the HR field, you tend to not limit yourself to statistical sampling because you then would miss outliers.  So, most HR statistical work tends to be let's look at the entire population of whatever it is we're looking at and go from there."  (Wright Dep., at 10:15–11:7.)

Wright was later questioned more specifically on statistical significance:

> Q: And do you recall the testimony it's generally around 85 to 90 employees at any given time, the ER?
> A: I don't recall that specific number, no.
> Q: And four employees out of 85 or 90 is about what, 5 or 6 percent?
> A: I'm agreeing with your math, yes.
> Q: Is that a statistically significant sample?
> A: In the HR field it sure is, yes.
> Q: Based on what?
> A: Well, if one employee had been hit, physically struck, by their boss, that's less than 5 percent. That's statistically significant. (Wright Dep., at 28:6–14.)

[6]      Not surprisingly, Defendants dispute the accuracy of his calculations.  *See* (Def.'s Mem. of law in Supp. of Mot. in Lim. to Preclude Test. of Christopher Wright, ECF No. 41, at 8).

[7]      "The Supreme Court has not provided any definitive guidance about when statistical evidence is sufficiently substantial, but a leading treatise notes that '[t]he most widely used means of showing that an observed

the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

Wright also opines that Defendants' employee departures are adverse to nationwide trends because older employees left at a greater rate than their younger counterparts.  (Wright Report, at 13.)  This conclusion suffers from the same analytical flaw already discussed, yet with an additional problem: the study Wright used to derive these "trends" compared employees younger and older than age 38, while the operative age Wright used to analyze Defendants' employee data was 40.  Age 38 is irrelevant for the purposes of an age discrimination claim. This age discrepancy not only makes his conclusions less reliable, but it could confuse the jury.[8] Wright's brief detour into the world of statistical analysis is not "based on appropriate methods and procedures" but is instead his "subjective belief or unsupported speculation."  *SemCrude L.P.*, 648 F. App'x at 213.

Finally, to the extent that any of Wright's testimony survives the filters of fit, reliability and qualifications, the testimony fails to offer specialized knowledge that would aid a jury.  *Cf. Lasorsa*, 2009 WL 2929234 at *5.  An expert must offer scientific, technical or other specialized knowledge to the jury, yet a large portion of Wright's expert report summarizes portions of the

---

disparity in outcomes is sufficiently substantial to satisfy the plaintiff's burden of proving adverse impact is to show that the disparity is sufficiently large that it is highly unlikely to have occurred at random.' This is typically done by the use of tests of statistical significance, which determine the probability of the observed disparity obtaining by chance."  *Stagi v. Nat'l R.R. Passenger Corp.*, 391 F. App'x 133, 137 (3d Cir. 2010) (citation omitted).

In a Title VII disparate impact case, "a plaintiff will typically have to demonstrate that the disparity in impact is sufficiently large that it is highly unlikely to have occurred at random, and to do so by using one of several tests of statistical significance. There is no precise threshold that must be met in every case, but a finding of statistical significance with a probability level at or below 0.05, or at 2 to 3 standard deviations or greater, will typically be sufficient." *Id.*

[8]     Connearney has not produced this study and does not plan to offer it at evidence while Defendants have been unable to find it.  (Tr. of Oral Arg., at 49:19–50:13.)  This makes Wright's statistical analysis even more suspect.

evidence according to Connearney's theory of the case and concludes that a violation of law occurred.  *See* (Wright Report, at 9–12, 14); *see also Lasorsa v. Showboat: The Mardi Gras Casino*, No. 07-4321, 2009 WL 2929234, *5 (D.N.J. Sept. 9, 2009) ("When the normal experiences and qualifications of laymen jurors are sufficient for them to draw a proper conclusion from given facts and circumstances, an expert witness is not necessary and is improper." (citation omitted)).

### III.

As with Wright, the Court's greatest concern with Bonalumi's testimony is whether it is relevant for the purposes of the case, so its analysis of her proposed opinions also begins with fit.

### A.

Connearney contends that four aspects of Bonalumi's proposed testimony qualify under Rule 702.  *See* (Pl.'s Mem. of Law in Op. to Def.'s Mot. in Limine, ECF No. 46-2, hereafter "Pl.'s Resp.," at 8–9).[9]  Among these, Bonalumi opines that the (1) Defendants investigation into the November 21 incident violated "accepted standards within the Hospital and nursing profession," (2) Defendants violated the "ANA Code of Ethics," and (3) Defendants' disciplinary action against Connearney related to the "Great Catch" incident "defeated the purpose of the program."  (Pl.'s Resp., at 8.)

These opinions suffer from the same defects as Wright's: the ADEA does not require Defendants to conform to "accepted standards" or the "ANA Code of Ethics."  It does not require

---

[9]    Connearney apparently does not seek to offer Bonalumi's opinions regarding the following:  the "average cost of turnover for a bedside RN," (Bonalumi Report, at 5), the Institute of Medicine's six aims for improving healthcare, (*id.* at 6), and how "unhealthy work environments contribute to medical errors," (*id.* at 7).  In any event, testimony on any of these topics would be excluded as they have nothing to do with what the jury needs to understand or decide.

Defendants to have a properly functioning "Great Catch" program.[10]  The ADEA prohibits age discrimination.  Bonalumi does not purport to offer testimony which could conceivably help the jurors decide whether or not Defendants violated the statute.  Moreover, discussion of so called "best practices" could only confuse the jury as to what standard to apply.

Bonalumi also makes impermissible legal conclusions.  *See Berckely*, 455 F.3d at 218.  In the section of her report titled "Equal Employment Opportunity Commission Standards," she remarks that "[i]n my opinion and professional experience, a timely, thorough, well-documented investigation into an event that may result in discipline or termination of an employee is required.  Termination of those who are protected by any of the qualifications of EEOC without appropriate investigation and documentation of events would be illegal under the protection of the law."  (Bonalumi Report, at 12.)

## B.

Bonalumi's remaining areas of purported expert testimony are not reliable.  She opines that "the turnover rate [of employees] should have been cause for the Human Resources Department and Nursing Administrators to investigate the circumstances causing a large number of staff members to be terminated or resign during Defendant Hogan's tenure."  (Pl.'s Resp., at 9.)  Bonalumi came to this conclusion without knowing if there was even an actual increase in turnover.  She conducted no statistical study (not that she would have been qualified to do so); she did not even review Defendants' employment data.  In fact, she did not see *any* definitive numbers related to turnover.  (Bonalumi Dep., at 26:24–29:10.)  She relied instead on testimony from two witnesses, Connearney and former employee Rebecca Baranowski.  (*Id.* at 54:1–57:24.)  Bonalumi said she "assumed" that since Connearney and Baranowski worked for

---

[10]     Defendants' "Great Catch" program is a program whereby nurses report to a safety coach when they have acted to prevent a mistake or error in treatment.  (Connearney Dec. ¶ 26.)

defendants that they would know about increases in turnover because "[p]eople talk and there's usually communication about [it]." (*Id.* at 27:14–18.)

Thus Bonalumi concluded solely from Connearney and Baranowski's complaints of increased turnover that, not only was there turnover in the department, but this turnover rate was high enough that it should have triggered an investigation (into what is not clear) by human resources. Bonalumi did not explain how she reached this conclusion. She did not compare this alleged turnover rate to a national average. In fact, she acknowledged that she did not know what the national turnover rate for an emergency department was and she did not investigate whether Defendants' turnover rate was higher or lower than a national rate. (*Id.* at 26:7–23.) This opinion is not reliable because it is simply her "unsupported speculation" rather than an opinion "based on appropriate methods and procedures." *SemCrude L.P.*, 648 F. App'x at 213.

### C.

Nancy Bonalumi has 38 years of experience working as a registered nurse. (Bonalumi Report, at 1.) She has held positions as a clinician, educator and administrator. (*Id.*) She also has experience working in a variety of hospital settings over the course of her career, including urban, rural and academic facilities. (*Id.*) Bonalumi also has experience in nursing leadership. She has "hired, counseled, disciplined and terminated employees." (*Id.*) Bonalumi satisfies Rule 702's qualification requirement.[11] This, however, does not save her proposed testimony.

An appropriate order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.

---

[11] Defendants do not dispute that Bonalumi is qualified to testify to the standard of care of nursing. They argue, however, that 1) this is not what she does in her report and 2) even if she did, the nursing standard of care is not relevant to this case.